STOKER, Judge.
This suit arises out of a loan participation between five banks. No statement of the issues in this litigation may be stated at this point without a detailed statement of the facts. Based on the facts and lack of any settled principles of law, we conclude that the judgment of the trial court should be affirmed, although for different reasons than those assigned below. The relevant facts stipulated to between the parties are set forth below.
FACTS
I.
This lawsuit arises out of a loan in which Mansura State Bank (MSB) purchased a 20 percent participation interest from Hibernia National Bank (HNB) (formerly Southwest National Bank). The subject loan was made on October 23, 1983 to DMT Rental Tools, Inc. (DMT). Other participants in the loan include Claiborne Bank & Trust, American Bank & Trust and National Bank of Commerce, who purchased participation interests of 8 percent, 30 percent and 16 percent in the subject loan, respectively. HNB retained 26 percent of the DMT loan for itself.
On October 26, 1983 a loan in the amount of $2,500,000 was made to DMT evidenced by a promissory note to the order of HNB. As security, the October 26, 1983 promissory note had the endorsement of Powell Oil Company, Ashy Enterprises, Thomas Powell, Mitchell Ashy and Davis Gautreaux. This loan was and still is secured by the pledged collateral mortgage note in the amount of $2,500,000 executed by DMT, *1277 which in turn is secured by a collateral chattel mortgage on inventory and equipment, and a collateral mortgage on a leasehold interest. At all times pertinent to this case, this loan was also secured by a pledge of a $100,000 certificate of deposit. In conjunction with the promissory note dated October 26, 1983 plaintiff advanced to HNB 20 percent of the funds loaned to DMT, pursuant to a “participation” relationship between plaintiff and HNB. A “Certification of Participation” was issued to plaintiff at that time. The other three participating banks advanced to HNB their respective percentages of funds loaned to DMT and were issued identical Certifications of Participation, but varying in amounts. On April 4, 1984 a beneficial interest of $250,000 of the participation purchased by MSB was transferred to Cot-tonport Bank (a sister bank to MSB) in accordance with an agreement which reserved to MSB the right to enforce the underlying obligation and which permitted MSB to repurchase the beneficial interest at any time.
II.
On or before January 26, 1985 HNB and the participant banks (MSB, Claiborne Bank & Trust, American Bank & Trust and National Bank of Commerce) reviewed and renewed the DMT loan, which was extended one year only until January 26, 1986, pursuant to a promissory note of that date. In conjunction with the renewal of the DMT loan, HNB renewed the certification of participation with MSB whereby MSB was recognized as owner of an undivided interest in the DMT loan to the extent of $479,705.87 of a total loan of approximately $2.4 million. The other three original participants at that time maintained their respective original percentage interests in the loan and identical certifications of participation were issued to them, which certifications of participation only varied in amount. As of January 26, 1985 HNB still maintained its 26 percent interest in the DMT loan.
In accordance with the agreement between HNB and the participating banks, HNB retained the documentation evidencing the DMT loan (except those documents which were recorded) and acted in the capacity of lead bank for itself, MSB and the other participating banks pursuant to the certifications of participation. HNB instructed DMT and the endorsers of the DMT loan that all payments on the loan must be made to HNB rather than to any of the participants and that any payments not made to HNB would not be credited to the DMT loan. In its position as lead bank on this loan to DMT, HNB has not been paid any fees or other compensation by plaintiff nor any of the other participant banks.
III.
During 1985 the fall in oil prices caused a decrease in value of equipment used by the oil industry, including that equipment securing the DMT loan. By November of 1985 the fair market value of certain equipment securing the DMT loan had fallen from $3.4 million to $1.2 million, which HNB and the participant banks learned of as the result of an appraisal in October of 1985. As a result of the appraisal, a meeting was held on November 5, 1985 among HNB and the participating banks, including MSB. The decision by HNB and all participating banks at this time was to advise the borrower, DMT, that DMT needed to provide additional collateral and take other steps if the loan was to be considered for renewal on January 26, 1986; counsel for HNB was then instructed to advise DMT of the decision of HNB and all participating banks which was accomplished by a letter dated November 12, 1985. On December 23, 1985 a meeting of all participating banks was held. Thomas Powell and Mitch Ashy, representing DMT, also attended. DMT and its endorsers confirmed that they were not able to comply with the terms of the November 12, 1985 letter. A proposal was made by DMT’s representatives to extend the DMT loan for 90 days from its due date in return for DMT bringing all interest current, paying $200,000 down on principal and continuing monthly payments during the 90 days. A vote was taken wherein three of the four participating *1278 banks and HNB approved the proposal. MSB abstained from voting, believing the DMT loan should be called when due if the terms of the November 12,1985 letter were not met. Mr Roy, on behalf of MSB, promised he would communicate his bank’s position shortly. By mid-January 1986, on the basis of telephone conversations, HNB knew that MSB was not in favor of extending the DMT loan, though there was no formal correspondence from MSB relative to MSB’s position on the matter.
IV.
By correspondence dated January 22, 1986 HNB advised DMT that it would be allowed an additional 90 days to pay the loan. Following HNB’s advising DMT it would be allowed an additional 90 days after January 26, 1986 to pay off the loan, HNB continued to confer with the participant banks on the handling of the loan and several meetings were held among the banks; however, MSB elected not to attend any of the meetings. The decision of HNB to allow DMT 90 days from January 26, 1986 and then subsequently not to file suit until after DMT advised HNB on September 5, 1986 that DMT would make no further payments on the subject loan was joined in and agreed to by all banks participating in the subject loan to DMT except MSB, which had previously objected to any extension of the loan by its letters dated February 6, 1986 and May 7, 1986.
Following the January 22, 1986 letter by HNB’s attorney to DMT, DMT paid all accrued interest on the subject loan on January 26, 1986, plus $200,000 of principal; thereafter DMT paid to HNB on the subject on or about the 26th of the months of February, March, April, May, June and July, the amount of $44,632.11 on each such date. Beginning in late 1985 and continuing through the first half of 1986, DMT indicated its intention to move the loan to another bank. Steps to move the loan were taken and evidence of those steps were provided to HNB and the participating banks. By letter dated February 6, 1986 MSB rejected the extension of the DMT loan and demanded full payment. This demand was reiterated in a letter dated February 25, 1986, along with the demand that HNB foreclose on the DMT loan or provide the original documents to MSB to permit it to foreclose. None of the demands of MSB in these letters were complied with by HNB.
V.
By letter dated February 14, 1986 from counsel for HNB to MSB, HNB stated that as lead bank with the concurrence of the remaining participating banks it could extend the DMT loan over the objection of MSB because it felt that such action was in the best interest of the banks. By letter dated March 6, 1986 from counsel for HNB to MSB, HNB declined to provide MSB with the necessary documents to foreclose and took the position with regard to filing suit for collection that all participating banks must make that decision as a whole. When the due date of April 26, 1986 arrived, HNB again did not demand full payment from DMT and granted a further extension of time to mid-June 1986 to pay off the DMT loan. HNB had the concurrence of all participating banks except MSB to this further extension. With regard to MSB, HNB extended the loan over the objection of MSB expressed in the letters from MSB. MSB filed the present suit on March 6, 1986. By letter dated May 7, 1986 HNB requested the written approval and acceptance of the extension of the DMT loan through June 16, 1986. By letter dated May 24, 1986 MSB expressly rejected the further extension.
VI.
Following its objections to the extension on January 26, 1986 MSB continued to accept its share of DMT’s payments of $44,-632.11 which continued to be made monthly through July of 1986, and this included its share of the $200,000 principal payment made by DMT in January of 1986 and the offsetting of the $100,000 certificate of deposit and a small checking account in October of 1986. Prior to DMT’s payment of accrued interest and the $200,000 of principal on January 26, 1986, the principal por *1279 tion of the interest of MSB in the subject DMT loan was $431,856.75. As a result of the these payments by DMT on January 26, 1986, and then monthly thereafter through July of 1986, and the remittance by HNB to MSB of MSB’s share of those payments, MSB received all interest accruing on its share of the subject loan monthly; by July 31, 1986 the principal balance on MSB’s share of the subject loan had been reduced by $70,724.16 to $361,132.59 and $ — 0— of accrued interest. On October 8, 1986 HNB remitted to MSB $20,607.33 as MSB’s share of the proceeds resulting from HNB exercising the right of setoff against: (a) the $100,000 certificate of deposit pledged to HNB as part of the security for the subject loan, and (b) a checking account maintained by DMT with HNB. The $20,607.33 was applied to the principal balance of MSB’s interest in the subject loan, leaving the balance on MSB’s interest in the subject loan at $340,525.26 of principal, plus interest from August 1, 1986.
VII.
For internal purposes, as of December 21, 1984, HNB categorized the DMT loan as marginal [loan to weak borrower but strong endorser] with the comment: “Debt is large in relation to equity and cash flow for debt service. Uncertainties apparent as to the stability of the primary source of repayment, with attention to secondary or alternate sources of repayment which appear to be adequate. It should be noted that the company has demonstrated improved profitability and operating trends.” As of October 10, 1985 the DMT loan continued to be categorized as marginal with the comment: “Debt service capacity of corporate and principal endorsers appears somewhat limited at this time, and protection afforded by collateral values on used equipment appear limited.” As of January 26, 1986 neither HNB nor MSB had undertaken any action to reduce or write off any portion of the DMT loan as uncollectible.
NATURE OF THE COMPLAINT AND ACTION
HNB filed suit by ordinary process against DMT and the endorsers of the DMT note in early October of 1986. The equipment mortgaged as security for the loan was sequestered. MSB and the other participant banks have joined in the lawsuit either as intervenors or co-plaintiffs or both. MSB intervened in the suit under a reservation of rights agreement with HNB without prejudice to any rights of MSB in the present suit. In this lawsuit against DMT, DMT and the endorsers have reconvened against HNB, MSB and the other banks arguing that HNB and the other banks had no right to file suit on the note.
All actions taken by HNB as lead bank on the subject loan from October 26, 1983 to this date have had the same effect and result, whether favorable or unfavorable, on the participating interests of MSB and the other participating banks and on the interest in the loan retained by HNB. HNB has taken no action as lead bank on the subject loan which gave HNB some benefit or value which was not shared on a proportional basis by all the participating banks, including MSB.
ACTION OF THE TRIAL COURT
The trial court rendered judgment in favor of defendant, HNB, finding that the parties to the loan participation had formed a partnership. The trial court’s written reasons for judgment state in pertinent part:
“The agreement between the parties lending the money is expressed in a document called Certificate of Participation, dated October 26, 1983, which reads, in pertinent part, as follows:
“ ‘THIS IS TO CERTIFY that MAN-SURA STATE BANK, MANSURA, LOUISIANA, is the owner of an undivided interest, to the extent of $500,-000.00 in DMT RENTAL TOOLS, INC., dated 10/_/83, in the amount of $2,500,000, bearing an interest rate of Chase Manhattan Bank of New York Prime plus 2% floating floor of 13%, first interest payments due 01//84, and then monthly principal and interest payments to begin 02/_/84 maturing for review on 01/_/85.
*1280 ‘By the issuance and its acceptance by the holder thereof, it is understood and agreed:
‘The foregoing evidence of the debt, together with all security and/or any other supporting documents pertaining thereto, are held by us in trust for the ratable benefit of all owners holding written evidence of their participation therein without preference or priority and without recourse on us.
‘We agree to account for all payments of principal and interest received by us for application upon the foregoing indebtedness and to distribute the same among the owners of participations in the proportion that the participation for each bears to the whole.
‘SOUTHWEST NATIONAL BANK OF LAFAYETTE will give to the share of the holder thereof in the foregoing evidence of the debt, and any documents relating thereto, the same care which it gives to its own share therein.’ ”[1]
# * ⅜ * * *
“After considering able and thorough argument in brief from both sides in this case, we conclude that the above cited language describes a partnership agreement, in which the partners have agreed to allocate risks and benefits ratably according to the extent of their individual investments. As a consequence of this, decisions affecting the management or operations were in the hands of the majority of the partners, absent stipulation otherwise. La. CC Art. 2807.
“We further find that there were stipulations otherwise, and that each partner must have contemplated two consequences, in order to be satisfied with the language of the participation certificates. First, that SNB would behave fairly, treating no partner preferentially and treating all other shares with the same care it extended to its own. Secondly, we find implicit in the language cited the expectation that each bank would be accorded in the decision-making a weight equal to its investment.
“As a consequence, although SNB had a fiduciary relationship vis-a-vis the group (as did each participant), this duty was discharged when SNB followed the letter and spirit of the agreement. This it did when it acted in accord with 80% of the ownership, distributed the profits rat-ably, and filed suit to foreclose in a reasonable time. All shares were accorded equal solicitude, and MANSURA STATE has received what its own Participation Certificate promised.
“There has been no breach of the contract, nor of any fiduciary duties of the partnership.”
Plaintiff appeals contending the trial court erred in characterizing the loan participants as partners rather than as co-owners of undivided interests. We affirm.
OPINION
The classification of loan participations is a subject which has received little attention in Louisiana jurisprudence. Apparently a participation contract can create a partnership or joint venture, an agency relationship, a debtor-creditor relationship, a trust or simply an assignment. See Teachers’ Retirement System v. Louisiana State Employees’ Retirement System, 456 So.2d 594 (La.1984); J.D. Hutchins, What Exactly is a Loan Participation?, 9 Rut-Cam. 447 (1978). The participation contract before us contains a rather indeterminate mix of language characteristic of different types of contracts, i.e. “owner of an undivided interest,” “held by us in trust,” “without recourse on us,” “owners of par-ticipations.” Plaintiff would have us characterize the participations as partial assignments and apply the articles governing co-owners.
We have carefully considered the trial court's conclusion that a partnership agreement arose between the banks. We do not agree. We also do not agree with the plaintiff-appellant’s characterization of the *1281 arrangement as a co-ownership arrangement in a precise legal sense requiring application of legal principles relating to co-owners’ rights. Although we affirm the trial court, we follow a different approach.
The plaintiff, Mansura State Bank, takes the position that HNB has violated its co-ownership rights resulting in a tortious conversion for which HNB must respond in damages. As damages MSB wants its investment returned by HNB, together with other elements of claimed damages. We resolve the issue in this case without resort to characterization of the arrangement of the sale of participations in the loan to DMT. That is to say, it is not necessary to view the arrangement in some traditional legal form such as a partnership or a co-ownership. In fact, we do not think sufficient evidence of intent exists to permit such an analysis.
As we read the sole writing between HNB and MSB, the Certificate of Participation (which is a counter-part of the sales to the other participating banks), it does little more than evidence a proportional ownership interest. This is about as much as we can draw from the certificate. There is no written or self-evident contract between HNB and MSB or the other participating banks. The bare facts are that the only contract is between the lead bank (now HNB, originally Southwest National Bank) and DMT. This consists of the traditional loan documents, the promissory note and customary forms of security posted. The lead bank as the lender had management and control of the loan. The lead bank and DMT are the contracting parties. We find nothing from which it can be implied that HNB transferred any right to manage or control the loan when it transferred interests to the participating banks.
MSB paid its funds for the participating interest acquired. One way or the other these funds went to DMT. HNB holds the note and security. All we can make of this is that the destiny of the venture rested with HNB and DMT. We are unable to find any principles that would permit MSB, or any participant, to later withdraw from its purchase and have its funds returned from the borrower or HNB. Likewise, we find no principle that would grant to a participating bank veto rights regarding such things as loan extensions. It seems to us that the participating banks were simply in a position to gain or lose through the existence of the loan to DMT and that the matter was in the exclusive control and management of HNB. The loan contract is HNB’s contract with DMT, not separate contracts flowing directly from the participating banks to DMT. Also, we are unable to find any authority for any sort of committee right to management and control of the loan through voting proportional interests.
Thus we conclude that MSB has not made out its cause of action to recover from HNB in this action.[2] While it may have cause to be dissatisfied with HNB’s handling of the business dealings with DMT, unfortunately we must conclude that MSB was powerless to do anything about it and was required to stand by, leaving the control of the venture in HNB. Also, under the terms of the participation agreement, MSB was without recourse against HNB for payment of the loan upon default by DMT, see First Pontchartrain Savings Assoc. v. Evangeline Fed. Savings & Loan Assoc., 487 So.2d 512 (La.App. 3d Cir.1986), and HNB had no obligation to turn over the evidence of the debt and the securities to MSB.
The judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiff-appellant.
AFFIRMED.

. The participation certificate dated January 26, 1985 is identical to that of October 26, 1983, except as to the dates, amounts and terms of payment in the first paragraph.

. This is not a suit for breach of contract. As noted above, MSB brought this suit as an action tort for tortious conversion. We do not reach the question of whether a suit for tortious conversion would lie if it were to be concluded that the law of co-ownership applied as MSB urges should be the case. On that issue we express no opinion.