557 So.2d 966 (1990)
GREAT SOUTHWEST FIRE INSURANCE COMPANY
v.
CNA INSURANCE COMPANIES, et al.
Nos. 89-CC-1938, 89-CC-1939.
Supreme Court of Louisiana.
March 12, 1990.
Alfred Landry, Landry, Watkins & Bonin, New Iberia, for applicant/respondent.
David Hurlburt, Fontenot, Andrus & Preis, Lafayette, for respondent/applicant.
DENNIS, Justice.
This is a suit by Great Southwest Fire Insurance Company, an excess liability insurance carrier, against Transportation Insurance Company, a primary liability insurance carrier. It seeks to recover sums that Great Southwest had to pay due to the alleged bad faith failure of Transportation to defend properly and settle a lawsuit against their common insured, Contract Cleaners, Inc. Whether the excess insurer can recover from the primary insurer, either directly or as subrogee of the insured, is the only question in this case.
The facts are these: John C. Youngblood was injured when he slipped and fell on a slate floor upon which Contract Cleaners had performed sealing work. Youngblood sued Contract Cleaners and obtained a judgment in the principal sum of $396,137.43. Youngblood did not sue Contract Cleaners' primary insurer, Transportation, or its excess insurer, Great Southwest. Nevertheless, Transportation defended Contract Cleaners and the two insurers paid the judgment. Transportation paid its primary policy limits of $300,000 plus interest, a total of $323,560. On September 9, 1986, Great Southwest paid $110,043.81, the amount recovered in excess of the primary policy limits plus interest.
Great Southwest filed this suit against Transportation for judgment in the amount of $110,043.81 plus interest, fees and costs, alleging that the excess of Youngblood's judgment over Transportation's policy limits was caused by the primary insurer's bad faith failure to settle within the policy limits *967 and to properly defend the interests of the insured, Contract Cleaners. Plaintiff alleges that it was damaged directly by the bad faith conduct of Transportation which caused it to be liable for the excess judgment and, further, that upon paying its share of the judgment against the insured it became conventionally and legally subrogated to the insured's right of action against Transportation. In the trial court an exception of no right or cause of action was overruled. The Court of Appeal refused to review this ruling, but we subsequently ordered it to do so. Great Southwest Fire Ins. Co. v. CNA Ins. Co., 533 So.2d 3 (La.1988). After the Court of Appeal's review, it affirmed the trial court's judgment overruling the exception, reasoning that, while Great Southwest had no independent or direct right of action against Transportation, plaintiff could assert the insured's right acquired through legal and conventional subrogation against Transportation for damage caused by Transportation's bad faith conduct. Great Southwest Fire Ins. Co. v. CNA Ins. Co., 547 So.2d 1339 (La.App. 3d Cir.1989). We granted writs to both plaintiff and defendant to consider whether the plaintiff has its own right that it may assert against the defendant directly and whether it may assert the right of the insured through subrogation. Great Southwest Fire Ins. Co. v. CNA Ins. Co., 551 So.2d 1309, 1310 (La. 1989).
The principle that good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation applies generally to all kinds of obligations, regardless of their origin. La.C.C. art. 1759. See also Exposé Des Motifs, La. Stat.Ann.C.C. Obligations 1987 Sp.Pamph. p. 2; 2 S. Litivinoff, Obligations §§ 4, 5 in 7 Louisiana Civil Law Treatise (1975); A. Levasseur, Louisiana Law of Obligations in General 28-29 (1988). Consequently, there is no doubt that under the alleged facts the insured, Contract Cleaners, would have had a right to recover from Transportation any excess judgment caused by Transportation's failure to perform its obligations to conduct settlement negotiations and defend in good faith. See, e.g. Holtzclaw v. Falco, 355 So.2d 1279 (La.1978) (on rehearing); Hodge v. American Fidelity Fire Ins. Co., 486 So.2d 233 (La.App. 3d Cir.) writ denied, 489 So.2d 917 (La.1986); Bowen v. Government Employees Ins. Co., 451 So.2d 1196 (La.App. 5th Cir.1984); Domangue v. Henry, 394 So.2d 638 (La.App. 1st Cir.1980); Champion v. Farm Bur. Ins. Co., 352 So.2d 737 (La.App. 3d Cir.1977); Cousins v. State Farm Mut. Ins. Co., 294 So.2d 272 (La.App. 1st Cir.) writ refused, 296 So.2d 837 (La.1974); Younger v. Lumbermen's Mut. Ins. Co., 174 So.2d 672 (La.App. 3d Cir.) writ refused, 247 La. 1086, 176 So.2d 145 (1965); Comment, Duty of Insurer to Settle, 30 La.L.Rev. 622 (1970).
We see no error in the Court of Appeal's conclusion that Great Southwest became conventionally and legally subrogated to Contract Cleaners' right against Transportation when Great Southwest performed the obligation that the primary insurer owed its insured because of its failure to perform in good faith. The thrusts of Transportation's argument against this conclusion are that, in general, no subrogation occurred because the insured, which ultimately sustained no loss, had no right or action to subrogate; that conventional subrogation did not take place because Great Southwest had an independent obligation to pay the excess judgment; and that legal subrogation did not take place because Transportation and Great Southwest were not bound with each other to pay the excess judgment. But each of these contentions is without merit.
Performance, which is the normal mode of extinction of an obligation by an obligor, may also be rendered by a third person, unless the obligor or the obligee has a specific interest in the obligation being fulfilled by the obligor personally. La.C.C. arts. 1854, 1855. See also Levasseur, supra at 200-201; S. Litvinoff, The Law of Obligations in the Louisiana Jurisprudence 614 (1979); 4 C. Aubry & C. Rau, Droit Civil Francois § 316 (6th ed. Bartin) in A. Yiannopoulos, 1 Civil Law Translations 156, 157 (1965); 2 M. Planiol, Civil Law Treatise, pt. 1 No. 400 (11th ed. La.St.L.Inst. trans. 1959). Performance by a third person *968 causes subrogation to take effect when authorized by law or by agreement. La.C.C. art. 1855. Accordingly, when the creditor receives his payment from a third person who, by operation of law or by virtue of contract, is substituted in his rights, this payment effects a change in the person of the creditor rather than an extinction of the obligation. La.C.C. art. 1855. See also Aubry & Rau, supra § 315 at 156. Transportation argues that it never became obliged to Contract Cleaners to repair the damage done by the primary insurer's bad faith conduct because Great Southwest had issued a policy to Contract Cleaners insuring against liability in excess of the primary insurance limits. But this is a non sequitur. The fact that an obligation created by the contract or the wrongful act of an obligor may be performed by a third person does not prevent the obligation from arising. Otherwise, even a tortfeasor would not be obliged to repair the damage to another caused by his fault whenever insurance was potentially available to compensate for the injury.
There is no requirement that the third person who performs the obligation must be disinterested in the obligation or its performance in order to be conventionally subrogated. The Civil Code provides simply that an obligee who receives performance from a third person may subrogate that person to the rights of the obligee, even without the obligor's consent, subject to the rules governing assignment of rights. La.C.C. art. 1827. There is no prohibition in the rules pertaining to assignment of rights against the transfer of credits, rights or claims to a third person with an interest in the performance of the obligation. La.C.C. art. 2642 et seq. Thus, subrogation by the consent of the creditor is always possible. Planiol, supra No. 479. The creditor, on receiving payment from a person other than the debtor, can always accord him subrogation to assure his recourse, just as he is always free to refuse it conventionally. Planiol, supra No. 479. In our experience, the vast majority of subrogees, such as insurer subrogees, have a preexisting interest in the performance of the obligation before becoming substituted to their creditors' rights against their codebtors.
Legal subrogation takes place when an obligor pays a debt he owes with others or for others and who has recourse against those others as a result of the payment. La.C.C. art. 1829(3). Transportation argues that Great Southwest did not become subrogated under this provision to the insured's claim against it for damages due to its failure to perform in good faith because Great Southwest did not owe the debt with or for Transportation. It is well established, however, that an obligor owes a debt with or for another if he is solidarily obliged with that person to perform the obligation. Planiol, supra No. 501; Levasseur, supra at 168; Aubry & Rau, supra § 321 at 202. It also seems clear that Transportation and Great Southwest were solidarily obliged to the insured to pay on its behalf the portion of the judgment in excess of the primary policy limits.
The essential elements of a solidary obligation are that the obligors are obliged to the same thing, that each is liable for the whole performance, and that the payment by one relieves the others of liability toward the obligee. La.C.C. art. 1794. See also Fertitta v. Allstate Ins. Co., 462 So.2d 159 (La.1985); Narcise v. Illinois Central Gulf R. Co., 427 So.2d 1192 (La.1983); Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La.1982); Sampay v. Morton Salt Co., 395 So.2d 326 (La.1981); Foster v. Hampton, 381 So.2d 789 (La. 1980); Pearson v. Hartford Acc. & Indem. Co., 281 So.2d 724 (La.1973). Transportation and Great Southwest were each obliged to pay off the portion of the judgment against the insured in excess of Transportation's policy limits caused by the primary insurer's bad faith failure to settle and to defend the insured properly. Each was liable for the whole performance, and the payment by either would have relieved the other of liability to the insured.
The fact that the insurers' obligations arose from separate acts and by different reasons did not prevent them from being bound solidarily. An obligation may be solidary even though it derives from a different *969 source for each obligor. La.C.C. art. 1797. See also Narcise, supra; Hoefly, supra; Pearson, supra; H. Alston Johnson, Developments in the Law, 1979-1980, Obligations, 41 La.L.Rev. 355 (1981). Indeed, the fact that each obligation was created in a different manner helps in this case to fulfill the requirement that a solidary obligation must arise from the law or from a clear expression of the parties' intent. La. C.C. art. 1796. Transportation's obligation arises from its legal obligation to perform its contractual duties in good faith and to respond in liability for all damages that are a direct consequence of its bad faith failure to perform. La.C.C. arts. 1759, 1997. Consequently, its obligation is in the nature of a penalty imposed for a wrongful act for which the obligor should be bound solidarily. See Levasseur, supra at 94. Great Southwest's obligation, on the other hand, arises from its agreement to pay damage awards against the insured in excess of Transportation's primary policy limits. But the nature and scope of the obligation and the manner in which it was contracted indicates the excess insurer's clear intent to be responsible solidarily, not jointly, for excess judgments against its insured. The contractual stipulation of solidarity need not be couched in express and formal terms provided solidarity arises from a clear expression of the parties' intent. La.C.C. art. 1796. See also Narcise, supra; Levasseur, supra at 95.
In general, the solidary obligor who extinguishes the debt is entitled to a right of contribution against his codebtors, but must divide his action so that he can demand from each one of them no more than his virile portion. La.C.C. art. 1804. There are exceptions to the rule, however. If the obligation arises from a contract or quasi-contract, the circumstances or agreement by the parties may cause the court to apportion liability differently. It may also appear that one of the obligors should be liable for the whole debt because he is to be considered as the principal obligor. La. C.C. art. 1796. See also Levasseur, supra at 103-104. In such a case, the other obligors will stand as sureties for the principal obligor. La.C.C. arts. 1804, 3035, 3037. Under the circumstances alleged in the present case, Transportation should be liable for reimbursement of the whole debt to Great Southwest because the primary's bad faith failure to perform caused the excess judgment and under the circumstances it should be considered the principal obligor.
Rules of solidarity, like all rules, are open textured. See H.L.A. Hart, The Concept of Law 120, 124-32, 233, 249 (1961). They are not always susceptible of easy or mechanistic application to the facts. Whether the law or the intent of the parties requires that an obligor be bound solidarily, rather than jointly, and whether the solidary obligor who extinguishes the debt is entitled to full indemnification or only contribution of virile portions, calls for an exercise of judgment after weighing all of the circumstances and policy considerations.
Finally, we are asked to reverse the holding of the Court of Appeal that a primary insurer does not owe a delictual duty to an excess insurer regarding the defense or settlement of claims against their common insured. We choose, instead, to affirm the decision of the appeals court. To extend the ambit of the primary insurer's duty to perform its good faith defense and settlement obligations for the benefit of the excess insurer would, in effect, be to recognize on behalf of the latter something very similar to an action for negligent interference with contract. Although it is clear that "bad faith" or "lack of good faith" in this context means something more reprehensible than ordinary negligence, imprudence or want of skill, it is apparent that our courts have perceived the terms to include some forms of gross fault as well as intentional and malicious failures to perform. This court recently recognized for the first time in some 87 years the possibility of a narrowly drawn action for intentional interference with contractual rights and indicated that it would proceed with caution in expanding that cause of action. 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989). Aside from undermining the court's resolve in that case to advance with care, recognition *970 of a duty by the primary insurer to conduct its settlement negotiations and defense efforts in good faith so as not to cause undue risk of harm to the economic interests of the excess insurer would be unwise for independent reasons.
Interference with contract, its modern inception lying in "malice," has remained, at common law, almost entirely within the province of intentional torts; and when various forms of negligence have either prevented or rendered more burdensome the performance of a contract, liability has generally not been extended. Prosser and Keeton on Torts § 129 at 997 (5th ed.1984). See also F. Harper, Interference with Contractual Relations, 47 Nw.U.L.Rev. 873 (1953); L. Green, Relational Interests, 29 Ill.L.Rev. 1041 (1935); C. Carpenter, Interference with Contractual Relations, 41 Harv.L.Rev. 728 (1928); Note, Negligent Interference with Contract: Knowledge as a Standard of Recovery, 63 Va.L.Rev. 813 (1977). When a loss suffered by an insured is paid by an insurer or another in a similar position, they are often allowed to subrogate and stand in the shoes of the insured, pursuing any claims the insured might have had against he who caused the loss. Prosser and Keeton, supra § 129 at 999. These cases ordinarily involve physical injury to person or property and always involve independent torts committed against the insured. The absence of the independent tort would prevent the subrogation since there would be no rights to which the insurer could be subrogated. The only question remaining, then, is whether the insured or the insurer recovers, since subrogation recoveries involve only one loss. Thus, in these cases no potential exists for a chain of recoveries of the kind that might be threatened under an interference with contract theory, in which interference with one also prejudices the performance of another contract and so on more or less indefinitely. Id. As the authors of Prosser and Keeton on Torts observe, "[i]t is not surprising therefore that in the absence of grounds for subrogation, insurance companies have been denied recovery for losses due to negligent injury to persons or property which they have insured...." Id. (footnotes omitted). Indeed, except for a very few cases to the contrary, there is little authority for negligent interference with contract in general. Id. at 1000. The policy against recovery based on negligence is rooted at least in part on what Professor James has called the "pragmatic objection," that while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, contract, or other business planning devices. Id. at 1001. See also F. James, Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal, 25 Vand.L.Rev. 43 (1972). The courts have generally followed this policy and, with a few limited and narrow exceptions, have refused to cross the bright line that has traditionally marked negligence claims for economic harm as off limits which would require them to substitute a case-by-case adjudication on the issue of proximate cause, an approach that may be unacceptable even to those who wish to expand liability for such interference. Prosser and Keeton, supra § 129 at 1001.
Other eminent torts scholars contend that the cases that are discussed as either supporting or refuting the existence of an action for negligent interference with contract can typically be explained better by reference to other legal principles, such as subrogation, for example, and that, on the whole, it seems preferable to avoid the negligent interference classification and to concentrate instead on those other explanatory principles. 2 F. Harper, F. James & O. Gray, The Law of Torts § 6.10 at 326 (2d ed.1986). They further observe that many of the cases are best understood in light of another principle: a general inhibition in negligence law against compensation for purely economic loss not the result of either bodily harm to the claimant or physical injury to property in which claimant has a proprietary interest. Id. at 329.
Except for a brief period in the 1920's, this court has disapproved of an independent action by an insurance company to recover from a tortfeasor for his damage *971 to the person or property of its insured. A short lived departure from the general rule against such an action in London Guarantee & Accident Ins. Co. v. Vicksburg, S. & P. R. Co., 153 La. 287, 95 So. 771 (1923) was strongly criticized by this court in later cases, Marquette Cas. Co. v. Brown, 235 La. 245, 103 So.2d 269 (1958); Forcum-James Co. v. Duke Transportation Co., 231 La. 953, 93 So.2d 228 (1957), and by legal commentators. See e.g. H. Alston Johnson, Work of the Appellate Courts for the 1977-1978 Term, Obligations, 39 La.L. Rev. 675 (1979); Comment, The Role of Subrogation by Operation of Law and Related Problems in the Insurance Field, 22 La.L.Rev. 225 (1961); Note, Obligations Insurer's Cause of ActionConventional and Legal Subrogation, 19 La.L.Rev. 726 (1959). In recent years, we have refused to recognize any right of action by an insurer to recover for its economic loss directly from a tortfeasor who had damaged its insured. Bosch v. Cummings, 520 So.2d 721 (La.1988); Hebert v. Green, 311 So.2d 223 (La.1975). See also, Henry v. Kipker, 525 So.2d 560 (La.App. 3d Cir. 1988).
Considering the foregoing factors and others such as the likelihood that a primary insurer's good faith duty to an excess carrier would evolve to include a duty to avoid negligent interference, the difficulty in reserving the negligent interference action to only excess insurers, the substantial although indirect protection that is already provided insurers legislatively by subrogation, the injustice and inefficiency that may be produced by encouraging insurers with independent rights to intervene in litigious matters in competition with their insureds, and the effect upon insurance administration and rates of requiring primary insurers' attorneys to serve three masters, we conclude that the primary insurer does not owe a duty of care or even of good faith performance to the excess insurer of its insured. Accordingly, if the excess insurer is to recover from the primary insurer for acts which make the excess insurer's contract and liability more burdensome, it must do so by asserting the insured's rights after becoming subrogated to them or after acquiring them through assignment. In a proper case, it may be possible for the excess carrier to recover directly from the primary insurer for damage caused by an abuse of right. See Illinois Central R.R. Co. v. International Harvester Co., 368 So.2d 1009 (La.1979); J. Cueta Rua, Abuse of Rights 35 La.L.Rev. 965 (1975). But this would require the pleading and proof of other factors in addition to or in lieu of the failure to perform in good faith alleged in the present case.
For the reasons assigned, the judgment of the Court of Appeal is affirmed.
AFFIRMED.
LEMMON, J., concurs.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
I consider that the majority erred in allowing the excess insurer to assert a cause of action against a primary insurer for that portion of the judgment in excess of the primary insurance coverage. The primary insurer's duties to the insured are based on the fiduciary relationship between them. No fiduciary relationship exists between the primary insurer and the excess insurer. Bad faith failure to settle a claim within the primary policy limits makes the primary insurer liable to the insured because the insured is subjected to personal liability for the excess judgment. The insured is not subjected to personal liability when there is excess insurance coverage. The primary insurer is not liable for the judgment in excess of the primary insurance policy when the insured has excess insurance coverage. Therefore, the primary insurer is not solidarily liable with the excess insurer for the excess judgment. Hence, the excess insurer does not have a cause of action against the primary insurer based on subrogation. Further, the primary insurer does not owe a duty to the excess insurer to defend or settle claims. Laper v. Board of Commissioners, 523 So.2d 926 (La.App. 4th Cir.), writ denied, 531 So.2d 275 (La. 1988). At most the primary insurer has a duty to keep the excess insurer informed of development and settlement negotiations *972 as generally recognized by the federal courts. Accordingly, I respectfully dissent.