IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 94-40377

---

AMERICAN BANK & TRUST OF COUSHATTA, ET AL.,

                                        Plaintiffs-Appellants,

                        versus

FEDERAL DEPOSIT INSURANCE CORPORATION,

                                        Defendant-Appellee.

---

Appeal from the United States District Court
for the Western District of Louisiana

---

(March 29, 1995)

Before HIGGINBOTHAM, SMITH, and PARKER, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

The issue in this case is the meaning of "good faith" under the Civil Code of Louisiana. Participants in a loan participation argue that the FDIC breached the duty of a lead bank to act in good faith. They contend that the duty of good faith is breached by gross fault, by negligence, or even by violations of the Golden Rule. The district court rejected these definitions, and found a failure of proof of malice in the record and granted summary judgment for the FDIC.

We agree with the reasoning of the distinguished district court, and affirm.

I.

In 1982, Bossier Bank & Trust loaned Retamco, Inc., $18 million secured by real estate called the Retama Property. BB&T then made four loans secured by the Retama Property, all participated in by other banks. The first tier of $8.5 million was secured by a first lien on the Retama Property and fifteen institutions, including BB&T, and the appellants were participants. A second lien on the tract secured a second loan for about $8 million in which BB&T and three other institutions participated. A third lien secured a third loan shared by five institutions for $1 million. A fourth loan, shared by three institutions for about $470,000, was secured by a fourth lien.

Retamco defaulted. BB&T failed. The FDIC was appointed as receiver and liquidator. The FDIC assumed the role of lead lender, with the responsibility of liquidating the Retama Property. The FDIC sold the property in 1991 for $1.2 million at public auction. It had, however, rejected several multi-million dollar offers for the Retama Property and had spent more than $1.9 million to maintain it.

Angry that the FDIC had sold the Retama Property for so little, four of the participant banks filed this suit. They claim that the FDIC violated its contractual and statutory duties by favoring FDIC interests over theirs and by mismanaging the liquidation. The FDIC held a large interest in the "subordinate" loans, and the four banks' sole interest was in the first tier

2

loan.[1]  The banks argue that the FDIC rejected offers that would have paid much of the debt owed to the first tier lenders, but not the subordinate loans in which the FDIC had a substantial interest.

The district court granted summary judgment for the FDIC on this claim.[2]  The court based its ruling on the key clause of the participation agreements, providing that BB&T (and now the FDIC)

> will exercise the same care with respect to the loan, and the collateral, if any, as it gives to loans and collateral in which it alone is interested; but BB&T shall not be liable for any action taken or omitted so long as it has acted in good faith.

Emphasizing its second half, the court ruled that the FDIC owed the banks only a duty to perform in "good faith," and the court looked to the Louisiana Civil Code for the definition of that critical term.  The Louisiana Civil Code does not define "good faith," but it does define "bad faith" as "an intentional and malicious failure to perform."  La. Civ. Code Ann. art. 1997 cmt. c (West 1987).[3]  Following Louisiana law, the district court then equated "good faith" with the lack of "bad faith."  See, e.g., Great Southwest

---

[1]  The FDIC had held only a .06 percent interest in the first tier loan.  In the "subordinate" loans, i.e., the second, third, and fourth tier loans, the FDIC had held much greater interests: 77.8 percent interest in the second loan, no interest in the third loan, and a 22.5 percent interest in the fourth loan.

[2]  The court also denied summary judgment on the FDIC's counterclaim, which sought the banks' share of the cost of maintaining and liquidating the Retama Property.  The FDIC does not appeal that decision.

[3]  Unlike the Civil Code, Louisiana's Commercial Laws do define "good faith."  See La. Rev. Stat. Ann. § 10:1-201(19) (West 1993) (defining good faith as "honesty in fact in the conduct or transaction concerned").  However, neither party contends that the Commercial Laws' definition controls.

Fire Ins. Co. v. CNA Ins. Cos., 557 So. 2d 966, 969 (La. 1990); Bond v. Broadway, 607 So. 2d 865, 867 (La. Ct. App. 1992), cert. denied, 612 So. 2d 88 (La. 1993); see also Commercial Nat'l Bank v. Audubon Meadow Partnership, 566 So. 2d 1136, 1139 (La. Ct. App. 1990) (analyzing bad faith as the mirror image of good faith); Heirs of Gremillion v. Rapides Parish Police Jury, 493 So. 2d 584, 587 (La. 1986) (implying that a party has acted in good faith unless he has acted in bad faith). The court held that the FDIC's actions may have been negligent, imprudent, or bumbling, but because they were not intentionally malicious, the banks could not state a claim.

On appeal, the banks challenge the court's definition of good faith. They argue that the duty to act in good faith is breached not only by acting in bad faith but by any of three other standards of care. They are, in descending order of stringency, (1) violations of the Golden Rule, (2) negligence, or (3) gross fault. Alternatively, the banks argue that even under the district court's bad faith standard -- a standard more lenient to the FDIC than any of their three candidates -- the court should have denied the FDIC's summary judgment motion in light of the banks' evidence of the FDIC's self-dealing.

We reject the banks' three definitions of breaches of good faith:  the Golden Rule, negligence, and gross fault. We also agree with the district court that a trier of fact could not reasonably conclude on the facts of this record that the FDIC acted with malice.

4

Louisiana no longer measures good faith by the Golden Rule. Apparently, it once did. In 1979, the Supreme Court of Louisiana observed that implied into every Louisiana contract was the equitable "'christian principle not to do unto others that which we would not wish others should do unto us.'" National Safe Corp. v. Benedict & Myrick, Inc., 371 So. 2d 792, 795 (La. 1979) (quoting La. Civ. Code Ann. art. 1965 (1977)).[4] Finding that National fell short of its implied contractual duty "to do to Benedict & Myrick that which it would wish Benedict & Myrick to do to it," the court found National Safe liable. Id.

Five years later, the legislature revised the Civil Code[5] and reenacted the statute that National Safe relied upon -- Article 1965 -- as Article 2055. Although the legislature stated in a comment that it intended new Article 2055 simply to reproduce the "substance" of old Article 1965, the legislative revisions dropped the Golden Rule. Old Article 1965 provided that

> The equity intended by this rule is founded in the christian principle not to do unto others that which we would not wish others should do unto us; and on the moral maxim of the law that no one ought to enrich himself at the expense of another. When the law of the land, and that which the parties have made for themselves by their

---

[4] Curiously, the word "christian" entered this statute by a mistake in translation from the French text. According to the Note to Article 1965, the word should have read "religious." See 16 La. Stat. Ann. Civ. Code (Compiled Edition) (1973) at 1120 for the original French text.

[5] See Brill v. Catfish Shaks of Am., Inc., 727 F. Supp. 1035, 1039 n.7 (E.D. La. 1989).

> contract, are silent, courts must apply these principles to determine what ought to be incidents to a contract, which are required by equity.

La. Stat. Ann. art 1965 (West 1977) (emphasis in original.) The Golden Rule is absent from revised Article 2055:

> Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.
>
> Usage, as intended in the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation.

La. Civ. Code Ann. art 2055 (West 1987). Nevertheless, old Article 1965 resists its death. Years after Article 1965 was revised, federal and state courts still cite the "christian principle" of old Article 1965, or National Safe's reference to it, without mentioning that Article 1965, as recodified as new Article 2055, failed to retain it. See, e.g., Devin Tool & Supply Co. v. Cameron Iron Works, Inc., 784 F.2d 623, 627 n.2 (5th Cir. 1986) (per curiam); Owl Constr. Co. v. Ronald Adams Contractor, Inc., 642 F. Supp. 475, 479 (E.D. La. 1986); Morphy, Makofsky & Masson v. Canal Place 2000, 538 So. 2d 569, 574 & n.8 (La. 1989); Gibbs Constr. Co. v. Thomas, 500 So. 2d 764, 767 (La. 1987); Hendricks v. Acadiana Profile, Inc., 484 So. 2d 242, 245-46 (La. Ct. App. 1986). We are hesitant then to reject the Golden Rule definition of good faith despite its loss of its statutory source.

We are persuaded finally to do so because we have been unable to find a single case since National Safe was decided in 1979 that actually applies it. Most courts that have cited old Article 1965

6

since 1979 have relied not upon the statute's "christian principle" but upon its rule that "no one ought to enrich himself at the expense of another." See, e.g., Owl Construction, 642 F. Supp. at 479; Morphy, 538 So. 2d at 575. Indeed, one Louisiana court has suggested that the "christian principle" is nothing more than a ban on unjust enrichment. See Hendricks, 484 So. 2d at 245-46. Even those courts that have used old Article 1965 to inform the meaning of the term "good faith" have not held that the duty of good faith demands refraining from doing unto others that which we would not wish them to do to us. See, e.g., Devin Tool, 784 F.2d at 627; Gibbs Construction, 500 So. 2d at 767. In short, the Louisiana Supreme Court's application of the Golden Rule in National Safe appears to have been an anomaly. We predict that the Louisiana Supreme Court would not choose to apply it again, and, in our best effort to replicate the Louisiana Supreme Court, we refuse to do so here.

## III.

The banks' attempt to define negligent acts as a breach of good faith is similarly ill-founded. Under Louisiana law a party can act in good faith and be negligent. In fact, the Louisiana Supreme Court recently rejected the negligence standard:

> Although it is clear that "bad faith" or "lack of good faith" in this context means something more reprehensible than ordinary negligence, imprudence or want of skill, it is apparent that our courts have perceived the terms to include some forms of gross fault as well as intentional and malicious failures to perform.

Great Southwest, 557 So. 2d at 969 (emphasis added); see also Bond, 607 So. 2d at 867 ("The term bad faith means more than mere bad

7

judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives.").  At oral argument, counsel for the banks properly conceded that he knew of no case in Louisiana or anywhere else that stated that negligence is a breach of good faith.

The banks' second line of argument is that the participation agreements adopt a negligence standard, both implicitly and explicitly.  By forcing the participant banks to depend on the FDIC to get the best price for the property, the participation agreements implicitly created what the banks call an "agency coupled with an interest," which imposed upon the FDIC the duty to act "in a manner that a reasonably prudent banker would have acted for his own interest in a nonparticipated loan."[6]  The participation agreements explicitly imposed a negligence standard, the banks argue, by demanding that the FDIC "exercise the same care with respect to the loan, and the collateral, if any, as it gives to loans and collateral in which it alone is interested."

We are not persuaded that the standard the banks find in the text and subtext of the participation agreements imposes a negligence standard.  As we read it, it imposes an anti-discrimination standard, which requires the FDIC to treat the

_____

[6]  In support of their argument, the banks cite Mansura State Bank v. Southwest Nat'l Bank, 549 So. 2d 1276, 1280 (La. Ct. App.), cert. denied, 553 So. 2d 473 (La. 1989), which found that a participation agreement can create an agency relationship, and Franklin v. Commissioner, 683 F.2d 125, 128 n.9 (5th Cir. 1982), which found that the terms of the participation agreement at issue made the lead bank the agent for the purposes of servicing of the loan.

8

participant banks' loans the same as it treated its own loans, a matter we will come to.

## IV.

Further, we agree with the district court that gross fault cannot be a breach of good faith under Louisiana law. The strongest support for the banks' gross fault standard is the Louisiana Supreme Court's statement that "our courts have perceived [the term 'lack of good faith'] to include some forms of gross fault." Great Southwest, 557 So. 2d at 969. Following the civil law tradition of Louisiana, the district court elevated statutory law over decisional law and gave Great Southwest little weight. Because Comment c to Article 1997 of the Civil Code defined bad faith as an intentionally malicious failure to perform, and because the Louisiana Supreme Court had made no "definitive statement" about the meaning of bad faith, the district court stated that it was "not free to abrogate the Louisiana legislature's unambiguous declarations." (Memorandum Ruling of March 22, 1994, at 4.)

We agree with the district court's careful adherence to Louisiana's civil law tradition. As an Erie court, our task is to anticipate the Louisiana Supreme Court's interpretation of the meaning of bad faith, see Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co., 953 F.2d 985, 988 (5th Cir. 1992), even when we construe Louisiana's civil law. See id. The Louisiana Supreme Court's statement in Great Southwest was dicta, sharply contradicted by the plain text of the comment to Article 1997. We believe that if the Louisiana Supreme Court were hearing this case,

9

it would brush aside the stray statement in Great Southwest and follow the clear dictates of the Louisiana Code. The only holding of Great Southwest was that negligence was not enough. The choice between gross negligence and malice was not before the court. Of course, these are common law, not civil law, observations. Nonetheless, they inform our prediction of the Louisiana Supreme Court's future course.

V.

Finally, the banks argue that the FDIC's actions were intentionally malicious.

We review the district court's determination that even after adequate discovery, the banks have not made a sufficient showing of bad faith. See FDIC v. Ernst & Young, 967 F.2d 166, 169 (5th Cir. 1992) ("A summary judgment is proper if after adequate time for discovery and upon motion [the nonmovant] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (internal quotation marks omitted)). The banks argue that the award of summary judgment was improper in light of evidence that the FDIC engaged in self-dealing and deliberately concealed vital information.

The banks' first contention is that the FDIC intentionally sacrificed the banks' interests in the first tier loan to protect the FDIC's large interest in the subordinate loans. They cite two instances. First, they argue that the FDIC elevated its own

10

financial interests over the banks' by rejecting an offer that would have paid the debt due most first tier participants, including appellants, but none of the subordinate tier participants, including the FDIC. The FDIC insists that there is no evidence that its rejection of this offer, the so-called Bearden contract, was in bad faith. The banks respond with deposition testimony of a former FDIC account officer, who stated that in liquidating the Retama Property he was "trying to do everything I could to recover a hundred percent of the first tier participants' monies, and attempting to extend down into the second tier, because the FDIC's largest dollar amount was in the second tier." The district court found, and we agree, that this deposition testimony establishes only that the FDIC properly put its own interest in the loans on a par with the other participants' interests. There is no evidence that the FDIC maliciously or spitefully rejected the Bearden contract to prevent the appellant banks from collecting. Consequently, we agree with the district court that a reasonable trier of fact could not conclude that the FDIC's rejection of the Bearden contract was intentionally malicious.

Second, the banks argue that the FDIC intentionally encouraged a group of investors, the Straus Group, to withdraw its lucrative offer to buy the Retama Property. The FDIC's self-interested motive was, allegedly, to protect itself from a potential countersuit. The banks' evidence shows that the FDIC promised the Straus Group that it would not sue the group, but this is no evidence of bad faith. The banks' evidence establishes that the

11

FDIC determined that the deal with the Straus Group was an option contract, not a contract of sale, which gave the FDIC no rights enforceable by suit. Even if the FDIC's assessment of the Straus Group's deal were wrong, it was not unreasonable, and there is no evidence that the decision not to sue was made in bad faith. It is true that the Straus Group later purchased the Retama Property for only $1,200,000, after having offered $8,750,000 originally. This embarrassment, however, does not create a jury question of whether the FDIC's failures were intentionally malicious.

Finally, the banks argue that the FDIC intentionally and maliciously concealed from them the existence of several offers for the Retama Property. They allege, for example, that the FDIC failed to tell them about a $7 million offer from the Straus Group in November 1988. However, by that time the FDIC had already committed Retama Property to auction, and the Straus Group's earnest money would not adequately compensate it for removing the property from the auction. In any event, the FDIC felt it could resume negotiations with the Straus Group if the auction did not produce an acceptable bid. Second, the banks allege that the FDIC deliberately concealed from them a lucrative auction bid from one Mr. Louis Cooper. Yet the district court found no evidence that the FDIC or the auction house knew Mr. Cooper had submitted a bid.

In short, the evidence that the banks have produced -- that the FDIC rejected the lucrative Bearden contract, that it failed to sue the Straus Group to enforce an offer, and that it failed to inform the banks of several offers -- at least would allow a trier

12

of fact to infer that the FDIC was negligent, not intentionally malicious.  We must agree that this is a sorry tale of bureaucratic bungling, but the step up to intentionally malicious is too great on this record.

AFFIRMED.