**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

September 25, 2014

Lyle W. Cayce
Clerk

————

No. 14-30033

————

RSUI INDEMNITY COMPANY,

Plaintiff-Appellant

v.

AMERICAN STATES INSURANCE COMPANY,

Defendant-Appellee

————

Appeal from the United States District Court
for the Eastern District of Louisiana

————

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

REAVLEY, Circuit Judge:

This is a dispute between excess and primary insurance carriers with a common insured. The excess insurer seeks to recover from the primary the amount that it paid on the insured's behalf to settle excess claims in an underlying lawsuit after the primary insurer had settled its own liability with the underlying plaintiff by paying its policy limit. The excess insurer sued under a theory of subrogation based on the primary insurer's alleged bad faith failure to defend properly the common insured.

The district court held that the excess insurer could not maintain the suit because there had been no adjudicated excess judgment against the insured in the underlying case. We hold that no excess judgment is required if the primary insurer's alleged bad faith failure to defend exposed the insured

No. 14-30033

to excess liability and caused the excess settlement. We therefore REVERSE the district court's summary judgment in favor of the primary insurer and remand for further proceedings.

## I.

In June 2010 Stacia Barrow was in a motor vehicle accident at an intersection in Port Allen, Louisiana, with Lamar Thomas, an employee of Ameraseal, L.L.C. Barrow's vehicle struck the rear of Thomas's vehicle as Thomas made a left turn in front of Barrow, who was allegedly speeding and made no effort to avoid the collision. Ameraseal owned Thomas's vehicle and maintained a primary liability insurance policy with a $1 million policy limit issued by Defendant-Appellee American States Insurance Company ("American"). It also maintained an excess insurance policy with a $4 million policy limit issued by Plaintiff-Appellant RSUI Indemnity Company ("RSUI").[1]

As a result of the accident, Barrow allegedly suffered numerous injuries to her back, lower extremities, hip, neck, and head. In June 2011, she filed suit in Louisiana state court against Thomas, Ameraseal, and American, but not RSUI.[2] Although it undertook defense of the suit, American did not immediately notify RSUI of Barrow's claims.

The state court set an initial discovery deadline of January 11, 2012, with a trial date in March 2012. In August 2011, Barrow's discovery responses indicated that she was claiming brain and spinal injuries. Despite the significant injuries claimed by the plaintiff and the possibility that Barrow's speeding was a contributing cause of the accident, the defense counsel assigned by American did not take depositions of Barrow, her doctors, or a potential

---

[1] We view the facts of this case in the light most favorable to RSUI, the non-movant in the summary judgment motion.

[2] Thomas and Ameraseal are hereinafter referred to collectively as "Ameraseal" or "the insured."

2

No. 14-30033

witness-passenger of the insured, nor did he attempt to obtain an independent medical examination. Defense counsel also failed to oppose Barrow's motion for summary judgment as to liability, which was granted by the state trial court.[3]

Two weeks before the expiration of the discovery deadline, American notified RSUI of Barrow's suit against their mutual insured. American took the position that the case was worth only between $150,000 and $500,000. In February 2012, however, American retained new defense counsel to review the file. Counsel opined that much more defensive action should have been taken to depose Barrow's doctors and experts, and he believed that the value of the case not only exceeded the $1 million primary policy limit but that a jury verdict could also exceed all excess coverage. Counsel advised the insured that American was nevertheless unwilling to offer the plaintiff its policy limits at that time.

Barrow subsequently demanded the combined policy limits of both American and RSUI ($5 million) to settle the case. In February 2012, after the close of discovery and only a few weeks before the scheduled start of trial, American agreed to provide Barrow its $1 million policy limit. In return, American received a release that (1) released American from any and all claims and (2) released the insured from liability for damages in excess of the available insurance limits provided by both American and RSUI. American then tendered the defense of the insured to RSUI, which had never been a named party in the case.

Rather than intervene in the suit on the eve of trial, RSUI negotiated a further settlement with Barrow. RSUI provided $2 million to Barrow in return

---

[3] Defense counsel did eventually take Barrow's deposition in late December 2011 but not before liability had already been established by summary judgment.

for a full release of Ameraseal from all liability. Because of RSUI's settlement with Barrow, the case was never tried and no judgment was ever entered against the insured.

RSUI filed the instant suit in federal district court against American as subrogee of the insured, alleging a claim based on American's bad faith failure to defend the insured properly in the underlying suit. RSUI sought recovery of the $2 million. Its theory was that American's failure to investigate and take appropriate defensive actions drove up the settlement value of the case, exposed the insured to additional liability, and left RSUI with no choice but to reach a settlement with Barrow on the eve of trial that was excess to the primary policy limit. RSUI's pleadings indicate that it believed American's improper defense included the failure to evaluate and investigate the claim adequately so as to develop a comparative default defense, which was lost when the defense failed to oppose the summary judgment motion as to liability; the failure to investigate the plaintiff's medical history and background and obtain prior medical records in order to contest damages; the failure to depose Barrow prior to the summary judgment; the failure to depose the passenger in Thomas's car, even though he told American that he believed Thomas was not at fault; the failure to retain appropriate neurological experts or to arrange for an independent medical examination; and the failure to consult with liability experts.

American moved for summary judgment, arguing that (1) RSUI's claim failed as a matter of law because it was an impermissible claim of legal malpractice against American's defense attorney, and (2) the claim failed as a matter of law because American never had an opportunity to settle with Barrow within its policy limits and there never was an adjudicated excess judgment. The district court granted American's motion, reasoning that the absence of an adjudicated excess judgment as to damages was dispositive and

No. 14-30033

barred RSUI's claim. The district court looked to case law holding that, in the absence of an adjudicated excess judgment, there can be no claim for an insurer's bad faith failure to settle. The court did not separately analyze RSUI's distinction between cases involving an insurer's bad faith failure to settle and cases involving a bad faith failure to defend.

RSUI now appeals. We are faced with the purely legal question whether, in the absence of an adjudicated excess judgment against the insured, RSUI may maintain its subrogated bad faith claim against the primary insurer to recover monies it paid in settlement of claims against the insured above the primary policy limit. For the reasons stated below, we hold that RSUI may assert its claim and that further proceedings are necessary to resolve the ultimate issue of bad faith and then, perhaps, damages suffered by RSUI.

## II.

We review the district court's ruling on summary judgment *de novo*, applying the same standard as the district court. *Crownover v. Mid-Continent Cas. Co.*, 757 F.3d 200, 204 (5th Cir. 2014). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All purely legal issues are given *de novo* review. *Clay v. F.D.I.C.*, 934 F.2d 69, 71 (5th Cir. 1991).

## III.

RSUI's position on appeal is simply stated: American, as the primary insurer, had a duty to defend Ameraseal but failed in bad faith to take basic, necessary defensive actions, which increased the amount of money necessary to settle the case and thereby exposed the insured to excess liability above the primary policy limit. It argues that by paying the increased amount necessary for the settlement on behalf of the insured, RSUI became subrogated to the insured's rights against American, and therefore RSUI may recover for its

5

payment caused by American's bad faith.  RSUI contends that, contrary to the district court's holding, an adjudicated excess judgment is not a prerequisite for a bad faith failure to defend claim.

American responds that summary judgment was proper because under Louisiana law an adjudicated excess judgment is essential to a bad faith claim for failure to settle, and that this requirement applies to both an insured's own claim against the insurer and to an excess insurer's claim based on subrogation to the insured's rights.  American draws no distinction between failure to settle claims and failure to defend claims.

Under Louisiana law, "[t]he duty to indemnify and the duty to defend clearly are separate and distinct duties."  *Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 638 So. 2d 1132, 1137 (La. Ct. App. 1994); *see also Arceneaux v. Amstar Corp.*, 66 So. 3d 438, 450 (La. 2011) ("'[T]he insurer's obligation to defend suits against its insured is broader than its liability for damage claims.'" (citation omitted)).  The insurer has an obligation to its insured at all times to act in good faith and to protect its insured from excess liability.  *Smith v. Audubon Ins. Co.*, 679 So. 2d 372, 376 (La. 1996).  This obligation clearly applies independently therefore to both the duty to defend and the duty to indemnify, as a breach of either duty could negatively affect the insured.  Indeed, "in every case, the insurance company is held to a high fiduciary duty to discharge its policy obligations to its insured in good faith—including the duty to defend the insured against covered claims and to consider the interests of the insured in every settlement."  *Pareti v. Sentry Indem. Co.*, 536 So. 2d 417, 423 (La. 1988).

The leading Louisiana authority on an excess insurer's claims for a primary insurer's alleged breach of the duties to defend and to settle is *Great Southwest Fire Insurance Company v. CNA Insurance Companies*, 557 So. 2d 966 (La. 1990), and resolution of the instant dispute must begin there.  In *Great*

No. 14-30033

*Southwest*, an excess liability insurer sued a primary insurer to recover for sums paid because of the primary insurer's alleged bad faith failure to defend properly and failure to settle a lawsuit against their common insured. *Id.* at 966. In that case, a judgment had been entered in the underlying lawsuit against the insured that exceeded the limit of the primary policy. *Id.* The primary insurer paid its policy limit, and the excess carrier paid the portion of the judgment above that limit. *Id.*

The Louisiana Supreme Court reasoned that both insurers were solidarily obliged to the insured to pay on its behalf the excess portion of the judgment, but for different reasons. The excess carrier was obligated because of its contractual promise to pay damages above the primary policy limits. *Id.* at 969. But the primary carrier was obligated because of its responsibility for all damages arising as "a direct consequence of its bad faith failure to perform." *Id.* The state supreme court determined that the primary insurer's bad faith had caused the excess judgment and that because the excess insurer satisfied the solidary obligation, the excess insurer thereby relieved the primary insurer of the primary's obligation to the insured and was entitled to seek recovery from the primary insurer. *See id.* The court held that this right of recovery by the excess insurer from the primary insurer arose by means of subrogation. *Id.* at 971; *see also id.* at 968 ("Legal subrogation takes place when an obligor pays a debt he owes with others or for others and who has recourse against those others as a result of the payment.").

The district court in this case accepted for purposes of the summary judgment motion that RSUI was validly subrogated to the insured in the claim against American, and no party disputes this point. Relying on several state and federal court opinions decided since *Great Southwest*, however, the district court held that there can be no claim for bad faith failure to settle unless damages have been determined in an adjudicated excess judgment against the

insured.  It held that the same principle applies to claims for bad faith failure to defend.

We think that the cases relied upon by the district court, and also by American on appeal, are distinguishable insofar as they lack a nexus between the primary insurers' alleged bad faith breach of their duty to the insured and resulting exposure to excess liability.  This causation element was central in *Great Southwest* to allowing recovery by the excess insurer.  *Great Southwest*, 557 So. 2d at 969 ("Transportation should be liable for reimbursement of the whole debt to Great Southwest because the primary's bad faith failure to perform *caused* the excess judgment and under the circumstances it should be considered the principal obligor." (emphasis added)).

In *Mathies v. Blanchard*, 959 So. 2d 986, 987 (La. Ct. App. 2007), cited by the district court here, an insured brought a cross-claim against her insurer for bad faith failure to settle in a pending underlying suit against the insured. The court held that the bad faith claim was premature because "an excess judgment is a prerequisite to an action for bad faith failure to settle a claim against an insured within the policy limits."  *Id.* at 988.  But in *Mathies* the only question was the prematurity *vel non* of the bad faith claim.  Because the case against the insured was still pending, it was not known whether there would be any damages at all, let alone whether there was a risk of excess damages.  It therefore made sense to apply the usual rule that an excess judgment is necessary before the insured could assert a claim against the insurer for bad faith because without an excess judgment the insurer would simply cover the damages with no personal loss to the insured.

Similarly, in *Louque v. Allstate Ins. Co.*, 314 F.3d 776, 783 (5th Cir. 2002), which was also cited by the district court, we held that a plaintiff could not pursue a putative class action for an insurer's alleged breach of its fiduciary duty in the absence of an adjudicated excess judgment because "Louisiana law

8

does not recognize an extracontractual obligation where there is no risk of exposing the insured to excess liability." The plaintiff there had alleged that the insurer's practice of failing to settle certain minor-injury claims regardless of a claim's merit, along with the resulting delays and judgments, affected the policy holders' creditworthiness. But as in *Mathies*, there was no showing of harm to the insured, as we noted there was neither an adjudicated excess judgment "nor even any claim that [the insurer's] decision to go to trial exposed [the insured] to excess liability." *Id.* Indeed, the plaintiff there specifically pleaded that the third-party claimants in the cases were claiming damages well below the applicable policy limits. *Id.* We emphasized that there was no cause of action against the insurer "[b]ecause [the insured] does not allege that [the insurer's] alleged refusal to settle exposed her to excess liability." *Id.*

This is unlike the instant case, where RSUI has alleged that American's bad faith caused excess liability exposure to the insured because American's conduct allegedly drove up the value of the case above the primary policy limit. The fact that RSUI stepped in and satisfied the increased amount to settle the case does not change the fact that the insured was allegedly exposed to liability above the primary limit that it may not otherwise have faced.

The case relied upon by the district court that comes closest to the instant case is *Ragas v. MGA Ins. Co.*, No. 96-2263, 1997 WL 79357, at *1 (E.D. La. Feb. 21, 1997). In that case, a plaintiff and an insured defendant agreed to an excess consent judgment over the objection of the insurer. *Id.* The insured then assigned to the plaintiff any rights it had against the insurer for improper claims handling in return for a release of liability, and the plaintiff then sued the insurer as the insured's assignee. *Id.* The parties there agreed that an excess judgment was a prerequisite to the bad faith claim, and the court had to decide whether a consent judgment was sufficient. *Id.* at *2. The court held that the plaintiff had no cause of action against the insurer for bad

faith failure to settle on the basis of the consent judgment because permitting the plaintiff to proceed "would allow a plaintiff to engage in collusion with the insured to fix and perhaps bootstrap damages, without ever having a judge or jury determine the amount of those damages." *Id.* The court further reasoned that allowing the case to proceed "would also create in the insured the ability to escape all liability for his own wrongdoing while imposing on the insurer (who neither participated nor consented to the Consent Judgment) unsupported liability." *Id.* The court held that the plaintiff therefore had no cause of action against the insurer for bad faith failure to settle in the absence of an adjudicated excess judgment against the insured. *Id.* at *3.

*Ragas* was different from the instant case insofar as it did not involve an excess insurer, nor claims of subrogation. And it was also a case where there was no risk of excess liability to the insured, who, as the court noted, did not even have an incentive to contest liability because of the possible collusion with, and resulting release from, the plaintiff. *Id.* at *2. American argues that the same risk is present here because an excess insurer could just as easily collude with the plaintiff. We do not see the same danger, however. Here the excess carrier is unlikely to collude with the plaintiff in the underlying action to reach a settlement. The excess carrier is contractually responsible for amounts above the primary limit and it therefore has an incentive to keep the damages within the primary limit or as low as possible above that limit. Unlike the insured in *Ragas*, who had no incentive to contest damages after obtaining a release and assigning his rights to the plaintiff, an excess insurer will be responsible for the settlement amount unless it can prevail on its subrogated bad faith claim. Such a risky strategy is an unlikely basis for collusion.

After *Great Southwest*, it is clear that an excess insurer may, through subrogation, assert claims against a primary insurer to "recover from the primary insurer for acts which make the excess insurer's contract and liability

more burdensome." *Great Southwest*, 557 So. 2d at 971. This is exactly what RSUI seeks to do. RSUI contends in essence that its payment of the $2 million settlement was made more burdensome than it otherwise would have been because of American's bad faith failure to provide a proper defense. In other words, but for American's failure to defend the case properly, such as by contesting liability or challenging damages through defensive depositions or an independent medical examination, the insured would not have faced liability above the primary limit, and RSUI may not have had to pay as much, or anything at all, to settle the case on the insured's behalf.

Allowing RSUI to pursue a claim for reimbursement of monies paid to settle excess claims against the insured that would not have otherwise occurred is consistent with the principle that a primary insurer must at all times act in good faith with the best interests of the insured in mind. *See Pareti*, 536 So. 2d at 423; *Smith*, 679 So. 2d at 376. It also follows from the teaching of *Great Southwest* that an excess insurer may recover from the primary insurer if the primary insurer's bad faith burdens the excess insurer's performance. *Great Southwest*, 557 So. 2d at 971; *see also St. Paul Ins. Co. of Bellaire, Tex. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 278 (5th Cir. 1991) (noting that after *Great Southwest* "the excess insurer will be able to recover from the primary insurer for the primary insurer's bad faith failure to settle the case within the primary limits, where such failure resulted in the excess judgment or compromise"). Moreover, it is also consistent with the general principles of insurance law, as recognized by at least one leading insurance treatise. *See, e.g.,* William T. Barker & Ronald D. Kent, *New Appleman Insurance Bad Faith Litigation* § 2.09[1] (2d ed. 2014) ("An insurer whose bad faith causes an excess judgment or necessitates an excess settlement is primarily liable to the insured on that account, and the excess insurer is

11

entitled upon discharging the insured's obligations, to assert the insured's rights against the primary insurer.").

This is not to say that RSUI is automatically entitled to prevail, however. Indeed, RSUI still must prove its case, including the issue of causation. The Louisiana Supreme Court made clear in *Great Southwest* that liability for a solidary obligation is generally subject to apportionment between the excess and primary insurers based on virile portions, although the circumstances may dictate that the court apportion liability differently. *See Great Southwest*, 557 So. 2d at 969 (citing La. Civ. Code art. 1804). The primary insurer could be responsible for the entire liability if the circumstances dictate that its bad faith failure to perform indicate that it should be considered the principal obligor. *Id.* We express no opinion on this question, as the district court decided only the legal issue of whether RSUI had a viable cause of action against American, and we believe that prudence should allow the district court the first opportunity to consider the parties' arguments and any competing facts.[4] *See,*

---

[4] American also argues that there can be no bad faith cause of action where the insurer never had an opportunity to settle within the policy limits. It reasons that because Barrow's only settlement offer was for the combined limits of the primary and excess policies, it never had a chance to prevent the plaintiff's claims from reaching RSUI's layer of coverage. In a recent unpublished decision, we held that whether a firm settlement offer is necessary for a bad faith failure to settle claim is unclear under state law, and we therefore certified the question to the Louisiana Supreme Court. *See Kelly v. State Farm Fire & Cas. Co.*, No. 12-31064, __ F. App'x __, 2014 WL 4437666, at *4 (Sep. 10, 2014). Unlike *Kelly*, we do not see this question as controlling here because, as already noted, this case concerns the excess insurer's claim that the primary insurer's failure to defend properly increased the value of the case, thereby exposing the insured to increased liability and making the excess insurer's liability more burdensome. Such a claim has already been recognized by the state supreme court in *Great Southwest*. Furthermore, American's argument that it never received an offer to settle below the policy limit may bear on the merits of RSUI's bad faith claim. In light of American's alleged bad faith failure to defend and contest liability, Barrow may have had no incentive to offer to settle for less than the policy limits. At this point, we cannot know whether additional defensive actions by American, such as deposing the plaintiff's doctors or seeking to defeat liability on the ground that the plaintiff was at least partially responsible for the accident, would have led to the plaintiff making a settlement offer below the primary limit. Such a determination is grist for the mill of the factfinder. Similarly, American contends that its settlement with Barrow was a so-called *Gasquet* settlement under state law,

No. 14-30033

*e.g., Pollock v. F.D.I.C.*, 17 F.3d 798, 802 n.6 (5th Cir. 1994); *CGL Underwriters v. Edison Chouest Offshore, Inc.*, No. 92-2474, 8 F.3d 21, 1993 WL 455600, at *9-10 (5th Cir. Oct. 22, 1993).

We hold only that under the circumstances of this case, where an excess carrier alleges that a primary insurer in bad faith breached its duty to defend a common insured properly and caused exposure of the insured to an increase in the settlement value of the case above the primary policy limit, which the excess insurer must then satisfy on the insured's behalf, the excess insurer has a subrogated cause of action against the primary insurer for any payment above what it otherwise would have been required to pay. We therefore reverse the judgment of the district court. Because there are issues still to be resolved, we remand for further proceedings.

REVERSED and REMANDED.

---

which adequately protected the insured. *See Gasquet v. Commercial Union Ins. Co.*, 391 So. 2d 466 (La. Ct. App. 1980). RSUI disputes this assertion. We need not decide the proper characterization of the settlement under *Gasquet* because whether American adequately protected the insured in the settlement goes to the merits of the bad faith claim, which the district court should be given the first opportunity to decide. Finally, we reject American's argument that RSUI's claim is for legal malpractice, as RSUI clearly is asserting that American's claims handling was to blame for the defensive failures in the underlying case.