**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 28, 2011

Lyle W. Cayce
Clerk

No. 10-30516

TESS WILTZ, doing business as Opelousas Crawfish House,

Plaintiff - Appellant

BEAUCOUP CRAWFISH OF EUNICE, INCORPORATED,

Intervenor Plaintiff - Appellant

v.

BAYER CROPSCIENCE, LIMITED PARTNERSHIP; ALLIANZ GLOBAL
RISKS U S INSURANCE COMPANY,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Louisiana

Before WIENER, BENAVIDES, and STEWART, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

The Louisiana crawfish industry suffered a precipitous decline when rice seed coated with a pesticide allegedly decimated the 1999-2000 farm-raised crawfish crop. The plaintiffs in this putative class action are buyers and processors of farm-raised crawfish who seek to recover their economic loss from the pesticide manufacturer under the Louisiana Products Liability Act (LPLA), LA. REV. STAT. ANN. § 9:2800.54. The district court granted summary judgment to the manufacturer because the plaintiffs' economic loss was unaccompanied by damage to their own person or property. For the following reasons, we affirm.

No. 10-30516

## I.  BACKGROUND

### A.     Crawfish farming and processing

Louisiana crawfish are farmed in rice ponds.  The Louisiana farm-raised crawfish crop allegedly suffered a precipitous decline beginning in the 1999-2000 crawfish season.  According to plaintiffs-appellants Tess Wiltz d/b/a Opelousas Crawfish House (Wiltz) and Beaucoup Crawfish of Eunice, Inc. (Beaucoup Crawfish), the decline was caused by the application of rice seed coated with ICON, a pesticide manufactured and sold by defendant-appellee Bayer CropScience, L.P. (Bayer).  ICON rice allegedly was introduced in Louisiana rice ponds during the 1999 planting season and taken off the market a few years later.[1]

The plaintiffs buy crawfish from crawfish farmers and then either resell the crawfish live or process them for tail meat.  As crawfish buyers and processors, the plaintiffs assert they play "an essential and necessary role in the creation, preservation and perpetuation" of the Louisiana crawfish industry. The plaintiffs have submitted evidence indicating that they create a market for small "peeler" crawfish, sell bait to crawfish farmers, provide loans to crawfish farmers, and provide logistical support to crawfish farmers by storing and transporting crawfish.  According to the plaintiffs, "the farmers and the Buyer/Processors are really one unified group and not two separate groups," and harm to the latter is "inevitable if a defective product were to sterilize or kill the

---

[1] Bayer has filed a motion to strike certain parts of the plaintiffs' brief.  We deny the motion.  The plaintiffs' discussion of the crawfish industry is supported by the record, including an expert report.  Similarly, the plaintiffs' discussion of the *Phillips* litigation, addressed below, is supported by the record and published case law.

No. 10-30516

crawfish crops." The plaintiffs allege they suffered economic loss when ICON rice drastically reduced the number of crawfish they could buy and process.

Although the plaintiffs have submitted evidence suggesting they work closely with crawfish farmers, the plaintiffs have not submitted any evidence suggesting ICON actually harmed *their* crawfish.[2] Nor is there any evidence that the plaintiffs were deprived of an actual, legal right to buy crawfish from the crawfish farmers.[3]

---

[2] The plaintiffs allege they own certain crawfish ponds, but there is no evidence those ponds were affected by ICON.

[3] The plaintiffs do not argue on appeal that they had legally enforceable contracts to buy crawfish from the crawfish farmers. Indeed, they acknowledge that "they have no breach of contract claims against the Farmers."

At times the plaintiffs have been somewhat more equivocal. Beaucoup Crawfish produced an affidavit asserting that "both the buyer/processor and the farmer/fishermen make a commitment for the entire crawfish harvest season to either buy all that they produce, or commit to a certain minimum or maximum number of sacks per day, [and] that these customary practices are widely known in the industry." Similarly, the plaintiffs' expert concludes that crawfish processors operate in a "supply chain structure" that "[i]n some cases . . . will impose production controls or input requirements on the supplier." According to the expert, this supply chain may "constitute a 'contract' as economists understand the term" for "purposes of economic analysis." Neither Beaucoup Crawfish nor its expert, however, purports to connect these generic statements about the crawfish industry to any actual contract relevant to this case. For her part, Wiltz acknowledged at her deposition that she did not have any agreement to buy all of a farmer's crawfish, nor was any farmer obligated to sell her all of its crawfish.

Even interpreted in the plaintiffs' favor, this evidence does not raise a justifiable inference that Wiltz and Beaucoup Crawfish had an actual, enforceable right to buy crawfish from any particular crawfish farmer. In any event, as discussed below, we think the Louisiana Supreme Court would deny the plaintiffs' claims even if they had an enforceable right to buy crawfish.

## B.    Crawfish litigation

Litigation concerning the decline in the Louisiana crawfish industry has been proceeding in the Louisiana state courts for some time.  Because some of this state litigation is relevant to our case, we provide a brief summary before turning to the case at hand.

In December 1999, a class of crawfish farmers sued Bayer and others in Louisiana state court.  The farmers' class action settled in 2004.

In 2000, a group of crawfish buyers and processors, including Beaucoup Crawfish, sued Bayer and others under the LPLA in Louisiana state court (the *Phillips* litigation).[4]  The claims asserted in the *Phillips* litigation are essentially identical to the claims asserted in this case.  After trial in July 2007, a jury found Bayer liable to three test plaintiffs.  Bayer appealed, asserting that its duty not to harm the farmers' crawfish did not extend to crawfish buyers and processors.  A five-judge panel of a Louisiana court of appeal reversed the judgments.  The five-judge panel reasoned that the plaintiffs "failed to prove a proprietary interest in the crawfish crop destroyed by the use of ICON." *Phillips v. G & H Seed Co.*, 10 So. 3d 339, 344 (La. Ct. App.), *writ denied*, 21 So. 3d 284 (La. 2009), *reh'g not considered*, 24 So. 3d 871 (La. 2010).

Back at the trial court, Bayer moved for summary judgment against all remaining plaintiffs.  Relying on the five-judge panel's decision, the trial court granted the motions on the ground that the plaintiffs failed to show a proprietary interest in the farmers' crawfish.  This time the plaintiffs appealed, asserting that the trial court erred in applying a bright-line "proprietary

---

[4] The *Phillips* litigation began as a putative class action but evolved into a large joinder action.

No. 10-30516

interest" requirement. According to the plaintiffs, the trial court instead should have used a multi-factor "duty-risk" analysis to determine the scope of Bayer's duty of care. A three-judge panel of the Louisiana court of appeal reversed the trial court's grant of summary judgment. *Phillips v. G & H Seed Co.*, __So. 3d__, 2011 WL 1773269 (La. Ct. App. May 11, 2011).[5] The three-judge panel "cho[s]e not to apply the law of the case doctrine" and "decline[d] to follow" the decision of the five-judge panel. *Id.* at \*4-5. The three-judge panel reasoned that the five-judge panel's decision "was contrary to the law" because it imposed "a bright-line litmus test mandating proprietary interest in damaged property as a prerequisite to recovery." *Id.* at \*5, 7. The three-judge panel thus remanded the case to the trial court with instructions to apply "a multi-factor, policy-driven, duty-risk analysis" to determine "the scope and extent" of Bayer's duties under the LPLA. *Id.* at \*5. The three-judge panel did not, however, "determine or even speculate on the result of the required duty-risk analysis." *Id.* at \*8.

Meanwhile, in December 2008, Wiltz filed this putative class action in Louisiana state court after she was denied leave to intervene in the *Phillips* litigation. *Phillips v. G & H Seed Co.*, 32 So. 3d 1134, 1138 (La. Ct. App.), *writ denied*, 38 So. 3d 325 (La. 2010). As mentioned, the LPLA claims asserted in this case are essentially the same as the claims asserted in the *Phillips* litigation. Bayer removed this case to federal court pursuant to 28 U.S.C. §§ 1332 and 1453. After removal, plaintiff Beaucoup Crawfish intervened as a second putative class representative. Bayer then filed a motion to abstain pending resolution of the *Phillips* litigation as well as motions for summary

---

[5] Bayer's application for rehearing en banc or for panel rehearing is currently pending before the Louisiana court of appeal.

No. 10-30516

judgment against both Wiltz and Beaucoup Crawfish. The district court denied Bayer's motion to abstain but granted both motions for summary judgment because the plaintiffs' economic loss was unaccompanied by damage to their own person or property. The plaintiffs appealed.[6] For the following reasons, we affirm.

## II.  STANDARDS

We review summary judgment de novo, using the same standards as the district court. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We view the evidence and all justifiable inferences in the light most favorable of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In a diversity case such as this one, we apply state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). There is no dispute that Louisiana law applies to this case. When faced with unsettled questions of Louisiana law, we adhere to Louisiana's Civilian decision-making process by first examining primary sources of law, namely, Louisiana's Constitution, codes, and statutes. *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 270 (5th Cir. 2009). This is

---

[6] The plaintiffs recently filed a motion to stay this appeal pending resolution of the *Phillips* litigation. We note that the plaintiffs filed their motion the same day the three-judge panel issued its decision in the *Phillips* litigation. We also note that the plaintiffs previously objected to a similar motion to stay filed by Bayer in the district court. It would thus appear that the plaintiffs' motion to stay is simply an attempt to preserve a victory in what they now perceive to be the more favorable forum. In any event, the plaintiffs have not established any other basis to stay this appeal. Accordingly, the plaintiffs' motion to stay is denied.

because the primary basis of Louisiana's Civil Law is legislation and not the prior decisions of its courts. *In Re: Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). In the absence of a definitive resolution in the State's primary sources, however, we look next to the final decisions of the Louisiana Supreme Court. *Moore*, 556 F.3d at 269. Only in the absence of such a final decision must we make an "*Erie* guess" as to how that court would resolve the issue if presented with the same case. *Id.* Although we do not disregard the decisions of Louisiana's intermediate courts unless we are convinced the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them. *In Re: Katrina*, 495 F.3d at 206.

## III. DISCUSSION

### A.    The economic-loss rule

In most jurisdictions, the "economic-loss rule" bars recovery in tort when a party suffers economic loss unaccompanied by harm to his own person or property. *See, e.g.*, *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 879 (1997) (noting tort law in area of commercial cases involving defective products "ordinarily (but with exceptions) does *not* permit recovery for purely economic losses, say, lost profits"); *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1027 (5th Cir. 1985) (en banc) ("Courts applying the tort law of Texas, Georgia, Florida, Alabama, Mississippi and Louisiana have consistently denied recovery for economic losses negligently inflicted where there was no physical damage to a proprietary interest."); *Great Sw. Fire Ins. Co. v. CNA Ins. Cos.*, 557 So. 2d 966, 970 (La. 1990) (recognizing the "general inhibition in negligence law against compensation for purely economic loss not the result of either bodily harm to the claimant or physical injury to property in which

No. 10-30516

claimant has a proprietary interest"); RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 21 cmt. d (1998) ("A second category of economic loss excluded from the coverage of this Restatement includes losses suffered by a plaintiff but not as a direct result of harm to the plaintiff's person or property."). The economic-loss rule has been characterized as a pragmatic limitation on both proximate causation and the scope of a defendant's duty of care. *Compare TESTBANK*, 752 F.2d at 1023 (noting the economic loss rule is "a pragmatic limitation imposed by the Court upon the tort doctrine of foreseeability), *with Rardin v. T & D Mach. Handling, Inc.*, 890 F.2d 24, 26 (7th Cir. 1989) ("The issue is not causation; it is duty."), *with Roberts v. Benoit*, 605 So. 2d 1032 (La. 1991), *on reh'g*, 605 So. 2d at 1052 ("Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy . . . .").

The economic-loss rule has a distinguished lineage traceable at least to Justice Holmes's opinion in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 308 (1927). In *Robins*, the employees of a dry dock negligently damaged a vessel subject to a charter agreement. *Id.* at 309. The charterer lost use of the vessel for a period of time and sued the dry dock in tort for economic damages. *Id.* The Supreme Court rejected the charterer's claim. The Supreme Court reasoned that the damage to the vessel "was no wrong to the [charterer] but only to those to whom [the vessel] belonged." *Id.* The Supreme Court concluded that the harm to the charterer "arose only through their contract with the owners," and that, as a general rule, "a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." *Id.* We recently

No. 10-30516

noted that *Robins* may be read as both denying recovery for economic loss resulting from physical damage to the property of another, and also denying recovery for negligent interference with contractual rights. *See Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram Barge Co.*, 639 F.3d 207, 210 (5th Cir. 2011). Although *Robins* strictly interpreted federal maritime law, its reasoning has influenced state tort law as well. *See, e.g.*, *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058, 1060 (La. 1984) (discussing *Robins* in context of Louisiana state tort law).

Courts and commentators have identified several justifications for the economic-loss rule. These justifications tend to echo four themes. First, without some pragmatic limitation on the tort doctrine of foreseeability, a defendant could be held liable for "wave upon wave of successive economic consequences." *TESTBANK*, 752 F.2d at 1028; *see also E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 874 (1986) (noting "foreseeability is an inadequate brake" on products-liability law).[7] As the Louisiana Supreme Court has recognized, "[b]ecause the list of possible victims and the extent of economic damages might be expanded indefinitely, the court necessarily makes a policy decision on the limitation of recovery of damages." *PPG*, 447 So. 2d at 1061-62. It is generally agreed that a line must be drawn somewhere, and the economic-loss rule has the virtue of being predictable and generally applicable. *TESTBANK*, 752 F.2d at 1028. Second, although the economic-loss rule may produce seemingly unfair outcomes in certain cases, a case-by-case approach is

---

[7] *See also Robins*, 275 U.S. at 309 ("The law does not spread its protection so far."); *Rardin*, 890 F.2d at 28 (noting the economic-loss rule was designed to limit "for-want-of-a-nail-the-kingdom-was-lost liability").

No. 10-30516

"no less arbitrary." *Id.*[8] This is because a case-by-case approach does not resolve the line-drawing problem but merely postpones it: ultimately, some plaintiffs will be allowed to recover and others will be found too remote. *Id.* A case-by-case approach has the additional drawback of producing unpredictable results that are "less judicial and more the product of a managerial, legislative or negotiated function." *Id.* Third, the economic-loss rule helps preserve the distinct functions of tort and contract law by allowing parties to allocate economic risks by contract. *E. River*, 476 U.S. at 870-71.[9] For example, when a defective product malfunctions and causes a purchaser to lose profits but nothing more, that loss "is essentially the failure of the purchaser to receive the benefit of its bargain," and the allocation of that loss is the "core concern" of private contracts and contract law. *Id.* at 870. Finally, the economic-loss rule promotes first-party loss insurance over third-party liability insurance. *TESTBANK*, 752 F.2d at 1029. A regime of first-party loss insurance efficiently encourages the party with the best information (that is, the party with knowledge of its own risk of loss) to decide whether to assume, allocate, avoid, or insure against its risk of loss. *Id.*; *see also Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002); *Rardin*, 890

---

[8] *See also E. River*, 476 U.S. at 875 (noting economic-loss rule avoids reliance "on a far murkier line").

[9] *See also Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 900 (5th Cir. 2010) ("The purpose of the doctrine is to maintain the traditional distinction between contract and tort."); *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002) ("Where tort law, primarily out of a concern for safety, fixes the responsibility for a defective product directly on the parties responsible for placing the product into the stream of commerce, contract law gives the parties to a venture the freedom to allocate risk as they see fit.").

10

No. 10-30516

F.2d at 26.[10] First-party loss insurance also is the more feasible way to mitigate disasters "inflicting large and reverberating injuries through the economy." *TESTBANK*, 752 F.2d at 1029.

## B.    Louisiana's version of the economic-loss rule

Louisiana is free, of course, to accept, reject, or modify the economic-loss rule in its own tort and products-liability law. As it happens, the Louisiana Supreme Court adopted a slightly modified version of the economic-loss rule in *PPG Industries, Inc. v. Bean Dredging*.

In *PPG*, a dredging contractor negligently damaged a pipeline owned by a natural-gas company. 447 So. 2d at 1060. As a result, the gas company was unable to fulfill a natural-gas contract with a manufacturer, and the manufacturer was required to obtain fuel from another source at an increased cost. *Id.* The manufacturer sued the contractor in tort for its economic loss. *Id.* The Louisiana Supreme Court rejected the claim, holding that the manufacturer's purely economic loss did "not fall within the scope of the protection intended by the law's imposition of a duty on dredging contractors not to damage pipelines negligently." *Id.* The court's reasoning was succinct, and similar to the primary justification for the economic-loss rule: for "policy reasons," the law does not "require that a party who negligently causes injury to property must be held legally responsible to *all* persons for *all* damages flowing in a 'but for' sequence from the negligent conduct." *Id.* at 1059, 1061. This is because the "imposition of responsibility on the tortfeasor for such

---

[10] *Cf. E. River*, 476 U.S. at 871 (noting economic losses "can be insured"); Richard A. Posner, *Common-Law Economic Torts: An Economic and Legal Analysis*, 48 ARIZ. L. REV. 735, 737-38 (2006).

11

damages could create liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 1061 (quotation marks omitted). In other words, "[b]ecause the list of possible victims and the extent of economic damages might be expanded indefinitely, the court necessarily makes a policy decision on the limitation of recovery of damages." *Id.* at 1061-62. The court concluded it was "highly unlikely" that the "duty not to negligently injure property encompass the risk that a third party who has contracted with the owner of the injured property will thereby suffer an economic loss." *Id.* at 1061.

Although the reasoning and result in *PPG* flow from the standard economic-loss rule, certain language in the decision left the door open for case-by-case adjustments. *PPG* emphasized that policy considerations determine the "reach" of the rule, and instructed courts to consider whether there is an "ease of association" between "the rule of conduct, the risk of injury, and the loss sought to be recovered." *Id.*; *see also Roberts*, 605 So. 2d at 1054 ("The critical test in Louisiana, however, is phrased in terms of 'the ease of association' which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?"). *PPG* also instructed courts to "consider the particular case in the terms of the moral, social and economic values involved, as well as with a view toward the ideal of justice." *Id.*

Before applying *PPG* to the case at hand, we must address one final point. The plaintiffs emphasize that *PPG* conducted a "duty-risk" analysis. This is true, because *PPG* involved a claim for negligence under Louisiana Civil Code article 2315, and the "Louisiana courts have adopted a duty-risk analysis in

No. 10-30516

determining whether to impose liability under [article] 2315."[11] *Pinsonneault v. Merch. & Farmers Bank & Trust Co.*, 816 So. 2d 270, 275 (La. 2002).  To prevail under a duty-risk analysis, a plaintiff must prove five separate elements:

1. the defendant had a duty to conform his conduct to a specific standard (the duty element);

2. the defendant failed to conform his conduct to the appropriate standard (the breach of duty element);

3. the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element);

4. the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and

5. actual damages (the damage element).

*Roberts*, 605 So. 2d at 1051.  As discussed above, *PPG* was primarily concerned with the first, second, and fourth of these elements.

Although our case involves claims under the LPLA, the parties agree that *PPG* still applies.  Indeed, the plaintiffs' main argument on appeal is that *PPG*'s duty-risk analysis provides "the appropriate analysis for determining liability and causation."  For its part, the Louisiana court of appeal has twice applied *PPG* to the same LPLA claims asserted in this case.  *See Phillips*, 10 So. 3d at 344; *Phillips,* 2011 WL 1773269, at *5.  Moreover, other Louisiana courts of appeal have conducted duty-risk analyses in LPLA actions.  *See, e.g.*, *Marks v. OHMEDA, Inc.*, 871 So. 2d 1148, 1153 (La. Ct. App. 2004) (analyzing "legal fault" and "duty" in LPLA action); *Goodrich v. Caterpillar, Inc.*, 717 So. 2d 1235,

---

[11]  Article 2315 states: "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."  La. Civ. Code. art. 2315.

1237 (La. Ct. App. 1998) (same).[12] In light of both the parties' failure to contest the issue as well as supporting decisions from the Louisiana courts of appeal, we are not convinced that the Louisiana Supreme Court would decide that *PPG* does not apply to claims under the LPLA. Accordingly, we will apply *PPG* to the plaintiffs' claims.

To be sure, our best *Erie* guess is that the Louisiana Supreme Court would apply *PPG* to the plaintiffs' claims. The LPLA imposes liability on manufacturers only for damages "proximately caused" by an unreasonably dangerous product. LA. REV. STAT. ANN. § 9:2800.54(A); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 261, 266 (5th Cir. 2002); *Jack v. Alberto-Culver USA, Inc.*, 949 So. 2d 1256, 1258 (La. 2007). As the Louisiana Supreme Court noted in *Roberts v. Benoit*, *PPG* may be thought of as a limitation on "legal or proximate cause." 605 So. 2d at 1052, 1056; *see also id.* at 1052 ("[P]roximate cause, or one of its functional equivalents, such as scope of the duty in duty-risk analysis, is necessary to truncate liability at some point."). *PPG* thus fits comfortably within the plain language of the LPLA.

Perhaps the more important point is that *PPG* is "a policy decision in purest form" that does not turn on fine distinctions between "proximate cause, legal cause, or duty." *Id.* at 1052. Although *PPG* specifically concerned a claim for negligence, its policy considerations apply with equal force in the products-liability context. *See E. River*, 476 U.S. at 871-74. Thus, just as *PPG* imposed

---

[12] *Cf. Dede v. Tip's Dev., L.L.C.*, 16 So. 3d 526, 529-30 (La. Ct. App. 2009) (noting that a "duty/risk analysis must be applied" in cases involving "injury as the result of the condition of a thing, whether under a strict liability theory or negligence liability theory").

a pragmatic limitation on the sweeping language of article 2315 of the Louisiana Civil Code,[13] so too, we predict, it imposes a pragmatic limitation on the LPLA.

Our prediction is not a stretch. Liability under the LPLA is expressly tied to liability under article 2315. The LPLA provides that "[c]onduct or circumstances that result in liability under this Chapter are 'fault' within the meaning of Civil Code Article 2315." LA. REV. STAT. ANN. § 9:2800.52. Thus, as one leading treatise notes, an LPLA claim against a manufacturer "continues to be in tort," and "all the peripheral characteristics of tort actions not specifically governed by the [LPLA] continue to be applicable, such as . . . proximate cause . . . ." WILLIAM E. CRAWFORD, 12 LOUISIANA CIVIL LAW TREATISE: TORT LAW § 16.23 (2d ed. 2011); *see also Quick v. Murphy Oil Co.*, 643 So. 2d 1291, 1295 (La. Ct. App. 1994) (recognizing same). As already discussed, one of the peripheral characteristics of tort actions in Louisiana is that they are governed by *PPG*. We predict LPLA actions too are governed by *PPG*.

## C.     **Application**

Reasoning by analogy, *PPG* strongly suggests that we should uphold summary judgment in this case. In *PPG*, a defendant negligently damaged property owned by a third party. As a result, the third party was unable to supply a product to the plaintiff, and the plaintiff suffered purely economic loss. The Louisiana Supreme Court held, as a matter of policy, that the plaintiff could not recover its purely economic loss in tort. Similarly, in this case, Bayer damaged crawfish owned by crawfish farmers. As a result, the farmers were unable to supply crawfish to the plaintiffs, and the plaintiffs suffered purely

---

[13] *See PPG*, 447 So. 2d at 1059 (finding that although "this case falls literally within the expansive terms of La. C.C. Art. 2315 . . . the customer cannot recover his indirect economic loss").

economic loss. The essential facts in this case thus mirror the facts in *PPG*. Unless there is some convincing reason to distinguish *PPG*, it would seem that the policy considerations at issue in that case would counsel the same result in this case.

The plaintiffs and others have pointed to three basic differences between this case and *PPG*, but we find that none justifies a different outcome. One difference is that the plaintiffs in this case did not have enforceable contracts to buy crawfish from the crawfish farmers. Thus, according to the plaintiffs, they "have not otherwise protected themselves from risk – indeed they have no breach of contract claims against the Farmers." In other words, the plaintiffs assert that they should be permitted to recover against Bayer in tort because they cannot recover against the crawfish farmers in contract. That the plaintiffs chose to run their business without enforceable supply contracts is not a satisfactory basis for distinguishing *PPG*. The plaintiffs are sophisticated participants in a multimillion-dollar commercial industry. Just as the manufacturer in *PPG* could have allocated the risk of a supply disruption in its contract with the natural-gas company, the plaintiffs here could have allocated the risk of a supply disruption by negotiating enforceable supply contracts in the first place. Indeed, by not negotiating such contracts, the plaintiffs would appear to have made a choice to bear the risk of a supply disruption, presumably because they did not think that risk was worth the cost of reallocation or insurance. The plaintiffs' own business calculation is not a sound reason to impose indefinite liability on Bayer.

If anything, the plaintiffs' failure to negotiate enforceable contracts with the crawfish farmers diminishes the "ease of association" between the damaged crawfish and the plaintiffs' economic loss. In *PPG*, there was no ease of

16

association between a damaged natural-gas pipeline and a manufacturer's lost profits *even though* the manufacturer had a contractual right to obtain gas from the pipeline. In other words, *PPG* held that not even a binding, contractual right to buy a third party's property was sufficient to create an ease of association between negligent damage to that property and the plaintiff's resulting economic loss. *See Roberts*, 605 So. 2d at 1056 (characterizing *PPG* as holding that there is no "ease of association" between the "duty not to damage someone else's property" and "the risk that the other party's business arrangements would be affected."). Here, the association between the damaged crawfish and the plaintiffs' economic loss is even more attenuated than in *PPG*. Even assuming the plaintiffs had some inchoate "proprietary interest" in the farmers' crawfish (as the plaintiffs contend), the plaintiffs still did not have an actual, enforceable right to buy those crawfish. The plaintiffs may have had reasonable expectations that they would be able to buy the crawfish, but the plaintiffs remained dependent on the farmers' continued goodwill because the farmers could have sold their crawfish to other buyers at any time.[14] Under such circumstances, we find that the "ease of association" between Bayer's allegedly negligent act and the plaintiffs' purely economic loss is too attenuated to support a cause of action in tort. As we have recognized before, "[i]f a plaintiff connected

---

[14] The plaintiffs' expert asserts that if "crawfish farmers sell their output to another buyer-processor, causing disruption to the buyer-processor's supply of raw crawfish, the buyer-processor may retaliate by refusing to purchase crawfish from that farmer in the future." He also asserts that if a buyer-processor fails to honor his purchase "commitment," "the crawfisherman would view that as being 'unloyal.'" Absent from the expert's characterization of these informal enforcement mechanisms (and the record) is any indication that the farmers or processors would be entitled to legal relief.

to the damaged chattels by contract cannot recover, others more remotely situated are foreclosed *a fortiori*." *TESTBANK*, 752 F.2d at 1024.

Even if the plaintiffs had some legal right to buy the farmers' crawfish, we believe the Louisiana Supreme Court still would reject their claims. As mentioned above, the existence of a contract was insufficient to justify recovery of purely economic loss in *PPG*. This is consistent with the Louisiana courts' refusal to recognize a cause of action for negligent interference with contractual relations. *See PPG*, 447 So. 2d at 1060 n.1 (observing that "[r]ecovery of economic losses for *negligent* interference with contractual relations is almost uniformly denied in other jurisdictions"); *Carter v. Smith*, 607 So. 2d 6, 7 (La. Ct. App. 1992) ("Louisiana does not recognize a cause of action for negligent interference with contract rights.").[15]    Notably, in *Great Southwest Fire Insurance Co. v. CNA Insurance Cos.*, the Louisiana Supreme Court refused to recognize a tort duty that "would, in effect, be to recognize . . . something very similar to an action for negligent interference with contract." 557 So. 2d at 969. The court's reasoning in *Great Southwest* was essentially the same as its reasoning in *PPG*: the court sought to avoid the threat of "a chain of recoveries," in which interference with one contract "also prejudices the performance of another contract and so on more or less indefinitely." *Id.* at 970. Indeed, *Great*

---

[15] *See also Hennig v. Alltel Commc'ns, Inc.*, 903 So. 2d 1137, 1141 (La. Ct. App. 2005) ("There exists no cause of action in Louisiana for recovery of physical or economic damages arising from negligent interference with contractual relations of a third party."); *Colbert v. B.F. Carvin Constr. Co.*, 600 So. 2d 719, 722 (La. Ct. App. 1992) ("We note that there is as yet no remedy in Louisiana for negligent interference with contract."); *cf.* RESTATEMENT (SECOND) OF TORTS § 766C cmt. a ("[T]here is as yet no general recognition of liability for negligent interference with an existing contract or with a prospective contractual relation . . . .").

*Southwest* analogized to the economic-loss rule and observed that "while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, contract, or other business planning devices." *Id.* *Great Southwest* further recognized that courts generally "have refused to cross the bright line that has traditionally marked negligence claims for economic harm as off limits." *Id.* The court stated that it would "proceed with caution" before expanding its "narrowly drawn action" for intentional interference with contractual rights. *Id.* at 969.

Here, the plaintiffs seek to impose a duty on Bayer that would, in effect, recognize a claim for negligent interference with contractual relations: the plaintiffs expected to buy crawfish from the crawfish farmers, and the plaintiffs allege that Bayer negligently interfered with the farmers' ability to satisfy that expectation. Moreover, the same policy considerations addressed in *Great Southwest* (and *PPG*) beset this case. The plaintiffs are commercial parties who could have protected themselves though contracts or insurance, and there are serious line-drawing problems concerning whether other parties intimately associated with the crawfish industry (e.g., crawfish retailers, restaurants, employees) would be allowed to recover as well. We see no indication that the Louisiana Supreme Court would be willing to extend tort liability to the type of iterative economic loss the plaintiffs seek to recover in this case.

A second potential difference between *PPG* and this case is that the plaintiffs here allege a "symbiotic" relationship with the crawfish farmers. According to the plaintiffs, "the farmers and the Buyer/Processors are really one unified group and not two separate groups," and harm to the latter is "inevitable if a defective product were to sterilize or kill the crawfish crops." The problem

No. 10-30516

with this argument is that it is the same one addressed by the Louisiana Supreme Court in *Roberts*: "[a]lthough ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone." 605 So. 2d at 1045; *cf. E. River*, 476 U.S. at 874 (finding that foreseeability alone "is an inadequate brake" on products-liability law). The ease of association test "melds policy and foreseeability into one inquiry." *Roberts*, 605 So. 2d at 1054. Thus, although it was certainly foreseeable that negligently damaging a natural-gas pipeline would cause manufacturers relying on that pipeline to seek fuel elsewhere at an increased cost, *PPG* nonetheless held, as a matter of policy, that the manufacturer could not sue in tort for its purely economic loss. Similarly, although it may have been foreseeable (even "particularly foreseeable," as the plaintiffs contend) that damaging the farmers' crawfish would cause crawfish processors to lose business, that is not a sufficient reason to permit recovery of purely economic loss in tort.[16]

A final factual difference between *PPG* and this case is that the plaintiffs here may not have had an alternative source of crawfish. The argument seems to be that Bayer's alleged negligence impacted most if not all crawfish farmers in the industry, and thus the plaintiffs had no way to mitigate their losses. Of course, as already discussed, one way for the plaintiffs to have mitigated their losses would have been to buy insurance or negotiate with the crawfish farmers over the risk of a supply disruption. In any event, we do not think the extent of

---

[16] We note that there is no evidence that Bayer knew anything about Wiltz and Beaucoup Crawfish in particular. Thus, although Bayer may have foreseen harm to the crawfish industry generally, there is no indication that it should have foreseen harm to the plaintiffs specifically.

a plaintiff's (or an entire industry's) loss determines the plaintiff's right to relief in tort. *PPG* did not even address the extent of the plaintiff's loss, and instead focused on the problem of allowing tort liability "in an indeterminate amount for an indeterminate time to an indeterminate class." 447 So. 2d at 1061. This problem would be exacerbated, not solved, by a rule permitting recovery in tort for purely economic loss whenever the harm to an industry is most widespread.

We note that our decision is consistent with other decisions by the Louisiana courts of appeal in similar cases. First, in the *Phillips* litigation, a five-judge panel of the Louisiana court of appeal has already held that *PPG* bars the exact same claims asserted here. *Phillips*, 10 So. 3d at 342-44. Although a three-judge panel of the same court recently "declined to follow" the five-judge panel, the three-judge panel notably did not hold that the plaintiffs were entitled to relief. *Phillips*, 2011 WL 1773269, at *8 (declining to "speculate on the result of the required duty-risk analysis"). Because we have conducted a duty-risk analysis and applied *PPG* to this case, our decision is consistent with both the three-judge panel's decision and the five-judge panel's decision. Second, in *Dempster v. Louis Eymard Towing Co.*, a Louisiana court of appeal held that fishermen could not recover purely economic loss from a barge that ruined a fishing site that the plaintiffs did not own. 503 So. 2d 99, 101 (La. Ct. App.), *writ denied*, 505 So. 2d 1136 (La. 1987). Notably, the plaintiffs could not recover even though they had been fishing in the spot "for years" and had invested capital in their fishing enterprise. *Id.* at 100. Similarly, in *Louisiana Crawfish Producers Association-West v. Amerada Hess Corp.*, a Louisiana court of appeal concluded that crawfishermen could not recover purely economic loss against oil companies that ruined a crawfishing site that the plaintiffs did not own. 935 So. 2d 380,

383-84 (La. Ct. App.), *writ denied*, 943 So. 2d 1094 (La. 2006).  Each of these cases is analogous, if not identical, to the case at hand.  Their consistent results, as well as the Louisiana Supreme Court's consistent refusal to review those results, reinforce our prediction that the Louisiana Supreme Court would not recognize the relief the plaintiffs seek in this case.

To conclude, after considering the Louisiana Supreme Court's decision in *PPG*, as well as the legally relevant moral, social, and economic values involved, we find that there is no "ease of association" between the damage to the farmers' crawfish and the plaintiffs' purely economic loss.  Although there may be some cases in which the Louisiana Supreme Court would authorize recovery in tort for purely economic loss, we do not think this commercial dispute is one of those cases.  Accordingly, we affirm the district court's grant of summary judgment.

## D.    Certification

As a final matter, the plaintiffs have requested that we ask the Louisiana Supreme Court to define "the level or degree of 'proprietary' interest sufficient to state a cause of action for economic damages."

We may certify a determinative question of Louisiana law to the Louisiana Supreme Court if the question is not resolved by the "clear controlling precedent" of the Louisiana Supreme Court.  LA. REV. STAT. ANN. § 13:72.1(A).  We are "chary about certifying questions of law absent a compelling reason to do so." *Jefferson v. Lead Indus. Ass'n., Inc.*, 106 F.3d 1245, 1247 (5th Cir. 1997).  Certification may be appropriate when there are "genuinely unsettled matters of state law." *Id.*  On the other hand, the mere "absence of a definitive answer from the state supreme court on a particular question is not sufficient to warrant certification." *Id.*

No. 10-30516

We find that there is no compelling reason to certify the plaintiffs' proposed question to the Louisiana Supreme Court.  A five-judge panel of the Louisiana court of appeal already has rejected the plaintiffs' arguments. *Phillips*, 10 So. 3d at 344.  The Louisiana Supreme Court already has declined (twice) to consider those arguments.  *Phillips*, 21 So. 3d 284 (La. 2009), *reh'g not considered*, 24 So. 3d 871 (La. 2010).  *Id.*  And in any event, as discussed above, we think this case is resolved by the Louisiana Supreme Court's clear and controlling decision in *PPG*.

## IV.  CONCLUSION

For the reasons stated, we AFFIRM summary judgment.  Bayer's motion to strike is DENIED.  The plaintiffs' motion to certify and motion to stay are DENIED.